**Linda ALBRIGHT, Plaintiff**

v.

**CITY OF PHILADELPHIA, Defendant.**

**No. Civ.A. 04–CV–316.**

United States District Court,
E.D. Pennsylvania.

Oct. 28, 2005.

Andrew M. Calvelli, Law Firm of Andrew M. Calvelli, Wayne, PA, for Plaintiff.

May Mon Post, Daniel L. Garry, City of Philadelphia Law Department, Philadelphia, PA, for Defendant.

## MEMORANDUM AND ORDER

BRODY, District Judge.

Plaintiff Linda Albright ("Albright"), a detective in the City of Philadelphia's Police Department, brings this suit against defendant City of Philadelphia ("the City"), alleging unlawful employment discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.,* and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S. § 955 *et seq.,* and

violation of her First Amendment right to free speech under § 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 (" § 1983"), and the Pennsylvania Whistleblower Law, 43 Pa.C.S. § 1423. Jurisdiction is appropriate based on the existence of a federal question pursuant to 28 U.S.C. § 1331. Albright invokes this Court's supplemental and pendent jurisdiction over her claims under the PHRA and the Whistleblower Law. The complaint was filed January 23, 2004.

Albright alleges that the City discriminated against her on the basis of her race and sex in denying her training and overtime opportunities, and that the City has discriminated and retaliated against her for complaining of what she believed to be gender and racial discrimination in the Southwest Detectives Division. Currently before me is the City's motion for summary judgment. The City argues that Albright's complaint alleges incidents of discrimination barred by the applicable statute of limitations periods; that Albright must be limited to alleging incidents contained with her second Pennsylvania Human Rights Commission ("PHRC") charge; that Albright cannot establish a prima face case of race or gender discrimination or retaliation under Title VII; that punitive damages are unavailable to Albright under Title VII and § 1983;[1] that Albright has not alleged material facts to support her claims of race and gender discrimination and retaliation under the PHRA; that Albright cannot establish that the City has municipal liability under § 1983 and that her even if municipal liability is found, her § 1983 claim fails against the City; and that Albright's claim under the Whistleblower Law is barred by the statute of limitations, and would fail even if it were not so barred.

---

1. Albright concedes this point and does not oppose summary judgment for the City on her punitive damage claims. (Pl.'s Ans. to Def.'s Mot. Summ. J. at 16, 19.)

## A. FACTUAL BACKGROUND [2]

Plaintiff Linda Albright was first employed by the City Police Department in 1986 and has been a detective assigned to the Southwest Detectives Division from 1997 through the present time. (Albright Dep. at 12–14.) [3] Albright is an African–American woman. (Def.'s Mem. Supp. Sum. J. Ex. B.) She does not claim any discrimination prior to 1999. (Albright Dep. at 14.)

In February 1999, Albright complained to Captain Bidley, her captain, that her supervisor Lieutenant Byrne was denying training to minority female police officers. (Albright Dep. at 16–17.) Captain Bidley told Albright that he would "try to correct the problem" and that she would be given the next available training. (Id. at 17.) Although Albright received the standard Municipal Police Officer training in 1999, she did not receive the outside training on crime scene processing that would help her with her career. (Id. at 17–18.) At her deposition, Albright stated that "Most of the males, as a matter of fact, the males were given this training. The females weren't given this training." [4] (Id. at 18.) She specifically identified four white male detectives who received outside training in

1999. According to Albright, she was denied training in every year since 1999, and was also given fewer opportunities for overtime than male detectives. [5] (Albright Dep. at 49–50.)

In 1999 and 2000, Lieutenant Byrne made comments to Albright's coworkers that "black females need to be kept in the kitchen making coffee." (Id. at 20–21.) Another captain approached Albright and told her that Lieutenant Byrne "didn't like black females," and that she should "watch herself." (Id. at 21–22.) Lieutenant Byrne also told Albright's coworkers that he didn't like Albright and that she was useless as a detective. (Id. at 22.)

On April 30, 2000, while on sick leave, Albright learned that Lieutenant Byrne had posted a computerized memorandum on the city-wide computer system accessible to all police personnel, stating that Albright was on "extended sick leave with a hysterectomy." (Def.'s Mem. Supp. Summ. J. Ex. B.) Albright considered this memorandum to be retaliation for her complaints about Lieutenant Byrne's discriminatory treatment of her. (Id.) Albright made a complaint within the department about the memorandum, and

---

2. For the purposes of summary judgment, the facts are stated in a light most favorable to Albright, the non-moving party.

3. Both parties submitted Albright's deposition as an exhibit to their briefs, Albright as Exhibit A and the City as Exhibit I. Therefore I will refer to the deposition by name, and not as an exhibit.

4. In response to Albright's allegations, the City notes that Albright was one of four detectives in the Southwest Detectives Division to receive crisis training in the year 2000, and that every black female detective received some sort of specialized training for the years 1999 to 2004, while seventeen named white male detectives did not. (Def.'s Mem. Supp. Summ. J. Ex. G.; Def.'s Mem. Supp. Summ. J. at 4.)

5. The City has also produced records showing that Albright earned more overtime than fourteen white male detectives in 1999; more than thirteen white male detectives in 2000; more than eight white male detectives in 2001; more than fifteen white male detectives in 2002 ($10,584.82) despite a three to four month leave of absence; and more than seven white male detectives in 2004 despite working only five months of limited duty for the entire year. (Def.'s Mem. Supp. Summ. J. Ex. H; Def.'s Mem. Supp. Summ. J. at 5–6.)

Albright testified that the most common ways to earn overtime are doing investigations and attending court; thus the detectives who worked the night shift were more likely to earn overtime in court, because court appearances were never during their scheduled shifts. (Albright Dep. at 45–47.)

Lieutenant Byrne admitted to posting it. (Albright Dep. at 24.)

On May 11, 2000, Albright dual-filed her first charge with the PHRC and the Equal Employment Opportunity Commission ("EEOC"), PHRC Complaint No. E95551D, EEOC No. 17FA02417, alleging that the City discriminated against her on the basis of race and gender by denying her training that it provided to "males and/or whites" and that Lieutenant Byrne had retaliated against her by posting the memorandum, causing her harm and humiliation. (Def.'s Mem. Supp. Summ. J. Ex. B.) On July 16, 2002, the PHRC informed the parties that it was dismissing the complaint.[6] (Id.)

When Albright returned to work in May 2000, after her complaints about the memorandum, none of her supervisors would talk to her. (Albright Dep. at 24.) The sergeants who worked with Albright would communicate with her by throwing notes on her desk before walking away. (Id. at 25.) Soon after Albright's return to work, her supervisors told her to input all of the complaints from the previous night, a condition which they had never imposed on any other officer. (Albright Dep. at 25). Albright was not paid for the extra hour required for this task. (Id.) Sergeant Nickels and Lieutenant Byrne yelled at Albright that night for making mistakes in typing complaints, threatened to give her "eighteens," a form of disciplinary action, and told her that they were putting her under close supervision. (Id. at 25–28.) Albright told the Sergeant and the Lieutenant that she knew this was about the complaint she had made, and in response, they told her that they were giving her close supervision because that was what they wanted to do. (Id. at 27–28.)

In June 2000, Albright went to Captain Glenn, a new captain at the time, and complained to him about the incidents since her initial complaint to Captain Bidley. (Id. at 31.) Captain Glenn allegedly responded by telling Albright that she could "go out and have a baby" to prove to the squad that she had not had a hysterectomy. (Id.) He also allegedly told her "You hurt my people. I will do what I have to do to hurt you. That includes eighteens." (Id. at 32.) After that, Captain Glenn would not allow Albright to work overtime under the Safe Streets program, because her paperwork was not completed, even though male detectives who were more delinquent in their paperwork were allowed to work Safe Streets overtime. (Id. at 91–93.)

After her return to work in May 2000, Albright's coworkers, including her close friend Detective Carter, told her that they felt pressure from their supervisors not to interact with her, so she ended up "isolated away from the rest of the squad." (Id. at 35.) Albright testified at her deposition that Lieutenant Byrne told several of Albright's coworkers that she had filed a PHRC complaint against him. (Id. at 33.) When Albright tried to get someone to accompany her on an investigation, she was unable to and had to investigate by herself, even if she did not feel comfortable doing so because of safety reasons.[7] (Id. at 35.) Albright testified that she did not hear Lieutenant Byrne tell coworkers not to accompany her, nor did any of her coworkers ever tell her that Lieutenant Byrne told them not to accompany her.

---

**6.** A dismissal by the PHRC grants a complainant the right to sue under the PHRA within two years of its receipt. 43 Pa.C.S. § 962(c).

**7.** Albright testified that there is not a policy within the Southwest Detective Division regarding partners, but that each detective is allowed to take another detective when they feel like it is necessary. (Albright Dep. at 35.)

(*Id.* at 37.) Albright sought help from the Employee Assistance Program ("EAP") twice in 2000, and the EAP sent her to see a psychiatrist. (*Id.* at 11–114.) The psychiatrist put her on medication for depression, which she has taken from September 2000 through the present. (*Id.* at 111–114.)

Albright faced more allegedly retaliatory actions. In November 2001, Sergeant McGowan gave Albright an oral warning about completing paperwork in a timely manner, but after Albright demonstrated that she had completed the paperwork, Sergeant McGowan did not issue a warning memorandum. (*Id.* at 62–63.) Albright testified that she was under pressure to document everything she did, and that she could not work under those conditions. (*Id.* at 63–64.) Another time, Sergeant McGowan also took an arrest from Albright and gave it to another white male detective, who arrested the wrong person, and then Sergeant McGowan assisted the civilian with making a complaint against Albright.[8] (*Id.* at 65–72.) Although the civilian filed a formal complaint against Albright, no disciplinary action was taken against her. (*Id.* at 71.)

In 2001, Sergeant McGowan told Albright that Sergeant Ryan placed notes in her drawer, telling her that Detective Albright and another woman were "problems in the squad." (*Id.* at 78–79.) Sergeant Ryan also told Lieutenant Maxwell that Albright was refusing to do paperwork, which was not true, provoking a rebuke from the Lieutenant. (*Id.* at 80–81.)

On March 5, 2002, Albright dual-filed a second complaint with the PHRC and the EEOC, PHRC Complaint No E102360D,

EEOC No. 17FA201744. (Def.'s Mem. Supp. Summ. J. Ex. C.) In this complaint, Albright alleged that the City's agents harassed her because she filed the first complaint, and that Lieutenants Byrne and McGowan denied her overtime by taking jobs from her and assigning them to male detectives. (*Id.*) She also alleged that she was repeatedly sent out alone on assignments where the policy is that she should be accompanied, that Sergeant McGowan coached a civilian male into filing a complaint against her, and that she was falsely accused of not contacting the District Attorney's office when she was supposed to. (*Id.*)

On May 7, 2002, Captain Glenn gave an order that Albright was not to attend a Police Bureau of Investigations ("PBI") training she had been scheduled to attend on May 14, because it was canceled. (Def's Mem. Supp. Summ. J. Ex. C.) On May 13, 2002, Albright learned that the PBI training was not canceled, but Albright was unable to attend due to the direct order from Captain Glenn. (*Id.*) On July 2, 2002, Albright amended her second complaint to include these events, which she considered to be "a clear act of retaliation" for the filing of her first complaint. (*Id.*) On July 2, 2003, the PHRC informed the parties that it was dismissing the complaint. (*Id.*) On October 27, 2003, the EEOC adopted the findings of the PHRC and issued a notice of right to sue. (Def.'s Mem. Supp. Summ. J. Ex. E.)

In August 2002, Albright's sergeant asked if she could go to the firing range the next day, and she told him she was not feeling well. (Albright Dep. at 94.) Captain Glenn then called her into his office

---

**8.** At her deposition, Albright testified that she did not remember the date. (Albright Dep. at 66.) In her second PHRC complaint, Albright alleged that Sergeant McGowan coached a civilian into filing a complaint against her regarding events that occurred on July 26, 2000. (Def.'s Mem. Supp. Summ. J. Ex. C.) The date of the underlying events is unclear, because Albright also stated that Sergeant McGowan was her supervisor from 2001 to 2002. (Albright Dep. at 61.)

and pressed her to explain the problem, even after she said that it was a "female problem." (*Id.* at 94–95.) He then questioned her fitness for being a police officer and forced her to take a sick day because she could not go to the range. (*Id.* at 95.) When Albright returned to work, she was told that she was on restricted duty and had to report to the City's medical center for an evaluation. (*Id.* at 95–96.) At the medical evaluation, Dr. Hayes said he knew somebody must have been after her. (*Id.* at 96.) For the three to four weeks Albright was on restricted duty, she could not receive overtime. (*Id.* at 97.)

Albright also testified that at certain times during this period, Captain Glenn would insist that she work where she could be constantly watched, while other officers were allowed to work at the back of the squad room. (*Id.* at 98).

On October 1, 2002, Albright dual-filed a third complaint with the PHRC and the EEOC, PHRC No. 200203862, EEOC No. 17FA360280. (Def.'s Mem. Supp. Summ. J. Ex. D.) This complaint alleged that Captain Glenn was retaliating for Albright's two earlier complaints when he placed her on restricted duty and scheduled her for a medical evaluation at the Department Clinic, even though she had a note from her doctor stating that she was fully capable of carrying out her regular duties. (*Id.*) The PHRC issued a letter of dismissal for the third charge on July 2, 2003. (*Id.*)

Some time between 2000 and 2003,[9] Sergeant Ryan yelled at Albright in front of the squad and told her that she was a trouble maker, and said "People like you, we don't need here." (Albright Dep. at 82.) Lieutenant Maxwell took no action against Sergeant Ryan, even though he witnessed the incident and met with Ryan and Albright privately, at which meeting Ryan reiterated that he did not like Albright and thought she was a troublemaker. (*Id.* at 82–83.) At least two supervisors told Albright that Captain Glenn was out to get her, including Sergeant Johnson, who stated that he did not want to get in the middle of it. (*Id.* at 91.) In 2003, Albright made a complaint to the Police Advisory Board about the practice Sergeant Ryan and some white male detectives had of betting on whether black complainants would know the meaning of a particular word that the detectives would use. (*Id.* at 84–85.)

Albright complained to Deputy Commissioner Johnson in 2000, 2001, 2002, and 2003. (*Id.* at 120–121.) Each time Albright spoke with him, Deputy Commissioner Johnson told her that he would help her transfer, and that she did not have to submit paperwork for the transfers.[10] (*Id.* at 123–24.) Albright also complained to Deputy Commissioner Charlotte Counsel in 2004. (*Id.* at 122.) Albright has not been transferred.

Albright has never been suspended during her career with the City, and has never received any formal discipline.[11] (*Id.* at 22.) She has never received an unsatisfactory performance report. (*Id.* at 30.) She claims a loss of similar employment because she tried to transfer to both the Homicide and Narcotics Intelligence units and was never transferred, despite being

---

**9.** When asked the date of this incident, Albright said: "That had to happen in maybe 2000, the end of 2000. Maybe 2002. Somewhere around maybe 2003. I would say 2003." (Albright Dep. at 83–84.)

**10.** Disturbingly, Albright testified that Deputy Commissioner Johnson called her at home in 2000 and asked her "If I help you, how would you show your appreciation?" (Albright Dep. at 124.)

**11.** At her deposition, when asked if she had ever received any discipline, Albright responded "Not to my knowledge." (Albright Dep. at 22.)

approved for transfer. (*Id.* at 109–110.) Captain Glenn, Sergeant Nickels, Sergeant Ryan, and Sergeant McGowan are no longer at Southwest Detective Division. (*Id.* at 119.)

## B. STANDARD OF REVIEW

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). There is a "genuine" issue if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must make an initial showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. In determining whether the non-moving party has established each element of its case, the court must draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## C. DISCUSSION

The City moves for summary judgment on the following claims: (1) Albright's claim that the City violated her right under Title VII to be free from gender and racial discrimination in the workplace, and from retaliation for filing her charges of discrimination; (2) Albright's claim that the City violated her right under the

PHRA to be free from gender and racial discrimination in the workplace, and from retaliation for filing her charges of discrimination; (3) Albright's claim that the City, acting under color of state law, deprived her of her right to exercise free speech pursuant to the First Amendment of the United States Constitution; and (4) Albright's claim that the City violated the Pennsylvania Whistleblower Law by retaliating against her for making good faith reports of wrongdoing by the City.

More specifically, the City moves for summary judgment on the following grounds: (1) that Albright's complaint alleges incidents of discrimination barred by the applicable statute of limitations periods; (2) that Albright must be limited to alleging incidents contained with her second Pennsylvania Human Rights Commission ("PHRC") charge; (3) that Albright cannot establish a prima face case of race or gender discrimination or retaliation under Title VII; (4) that punitive damages are unavailable to Albright under Title VII and § 1983; (4) that Albright has not alleged material facts to support her claims of race and gender discrimination and retaliation under the PHRA; (5) that Albright cannot establish that the City has municipal liability under § 1983 and that her § 1983 claim fails against the City regardless of municipal liability; and (6) that Albright's claim under the Whistleblower Law is barred by the statute of limitations, and would fail even if it were not so barred. For the reasons set forth below, the City's motion is granted as to Albright's claims under § 1983 and the Pennsylvania Whistleblower Law. The motion is granted in part and denied in part as to Albright's claims under Title VII and the PHRA.

1. *Albright's Title VII and PHRA Claims* [12]

12. As a preliminary matter, Albright concedes that punitive damages against the City are not

Albright alleges race and sex discrimination and retaliation under Title VII and the PHRA. She dual-filed three charges of discrimination with the PHRC and the EEOC. (Def.Mot.Ex. B, C, D.) The City argues that Albright is limited to alleging incidents of discrimination included in her second charge, because all of her claims related to other incidents are barred by the applicable statutes of limitations or exhaustion requirements. (Def's Mem. Supp. Summ. J. at 9–12.)

■ An individual claiming employment discrimination must generally file a charge with the EEOC within 180 days of the last alleged discriminatory act. *See* 42 U.S.C. § 2000e–5(e)(1). This period is extended to 300 days, however, if the plaintiff resides in a deferral state, that is, a state with an agency authorized to grant relief from federally prohibited employment discrimination. *Id.; Watson v. Eastman Kodak Co.,* 235 F.3d 851, 854 (3d Cir.2000). The Third Circuit has held that "[i]t is undisputed that Pennsylvania is a deferral state." *Watson* at 854. Therefore, in her charges to the EEOC, Albright could properly allege discriminatory acts under Title VII that took place in the three-hundred day period preceding each charge.

A discrimination plaintiff then has ninety days to bring suit under Title VII from the date of receiving a right to sue notice from the Equal Employment Opportunity Commission. 42 U.S.C. § 2000e–5(f)(1). In this case, Albright only received a right-to-sue letter from the EEOC for her second charge, filed on March 5, 2002. (Def.Mem.Supp.Summ. J. Ex. E.) The letter from the EEOC was mailed on October 27, 2003, and Albright filed the present suit within ninety days, so all incidents within the second charge are timely, and her claims in the second charge have been subjected to administrative exhaustion.

With respect to her first EEOC charge, Albright has not taken the final step in exhausting her administrative remedies. "Where there is no final agency action, there is no limit on the time in which a suit may be filed in district court." *Waiters v. Parsons,* 729 F.2d 233 (3d Cir.1984). The ninety-day period "does not begin to run unless and until there is 'final agency action.'" *Burgh v. Borough Council of the Borough of Montrose,* 251 F.3d 465, 470–71 (3d Cir.2000). There is no requirement that a complainant request a right-to-sue letter if the EEOC is slow in processing the claim. *Id.* at 470. By virtue of the fact that the EEOC has never issued a right-to-sue letter related to her first charge, the statute of limitations on those claims has not run.[13]

available under Title VII. (Pl.'s Ans. to Def.'s Mot. Summ. J. at 16.) The statutory language itself compels this conclusion, as 42 U.S.C. § 1981a(b)(1) explicitly exempts "a government, government agency or political subdivision" from punitive damages recoverable in a Title VII action. Therefore the City's motion is granted with respect to Albright's claim for punitive damages under Title VII.

13. The right-to-sue letters that the PHRC sent to Albright do not constitute final agency action by the EEOC. They include no mention of making claims under federal law or filing in federal court, and do not say anything about a ninety day period in which to file suit in federal court. *See Gokay v. Pennridge School District,* No. 02–8482, 2003 WL 21250656

(E.D.Pa.2003) ("We are aware of no case in this circuit holding that the closure of a state law administrative case by a state agency triggers the federal Title VII limitations period").

Other circuits and districts have held that only a right-to-sue letter or its equivalent from the EEOC can trigger the ninety day federal filing period. *Vielma v. Eureka,* 218 F.3d 458, 466–68 (5th Cir.2000) (collecting cases). 42 U.S.C. § 2000e–5(f)(1) states only that the ninety day period is triggered by a "right to sue" letter from the EEOC, and such letter "appears to be the exclusive mechanism for commencing the federal filing period." *Id.* at 466. *See also Muth v. Cobro Corp.,* 895 F.Supp. 254, 256 (E.D.Mo.1995) (based on

Failure to obtain the letter before filing this suit, however, does not bar Albright from bringing these unexpired claims. The Supreme Court has held that filing a timely charge with the EEOC "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). The Third Circuit expanded on *Zipes* by reversing a district court that had dismissed claims for failure to exhaust where the plaintiffs had obtained right-to-sue letters on some claims but not others. *Anjelino v. New York Times Co.*, 200 F.3d 73 (3d Cir.1999). The court reaffirmed its prior holdings that "the failure to obtain a right-to-sue letter, in particular a second one for a retaliation claim, is curable at any point during the pendency of the action." *Id.* at 97. Albright is entitled to a right-to-sue letter at any time, because over 180 days have elapsed since she filed that charge with the EEOC.[14] *See* 29

C.F.R. § 1601.28(a)(1); *Burgh,* 251 F.3d at 470 (3d Cir.2000). Therefore Albright may include the events in her first EEOC charge provided she promptly request a right-to-sue letter from the EEOC.

■ Because Albright alleges retaliation in her second EEOC charge, the related and continued retaliation in her third charge can be said to fall "fairly within the scope of the prior EEOC complaint." In *Waiters v. Parsons,* 729 F.2d 233 (3d Cir. 1984), the Third Circuit recognized that it is proper to permit "suits based on new acts that occur during the pendency of the case" if a previous EEOC case has been filed. *Id.* at 237. The court stated that "the relevant test in determining whether [plaintiff] was required to exhaust her administrative remedies, therefore, is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." [15] *Id.* The facts of *Waiters* are similar to the present case in pertinent respects. Carol Waiters' EEOC complaint charged retaliation for the earli-

statutory language, letters from state agencies do not trigger the ninety-day period); *Black v. Brown Univ.,* 555 F.Supp. 880, 884 (D.R.I. 1983) (rejecting plaintiff's assertion that right-to-sue letter from state agency is equivalent to an EEOC right-to-sue letter based on plain language of statute); *Perez–Cordero v. Wal–Mart PR. Inc.,* 235 F.Supp.2d 95, 102 (D.P.R. 2002) (noting the significance of the failure of the local agency letter to give notice of the limitations period that would run upon receipt of the EEOC letter, when the EEOC letter itself states the 90–day limit in bold letters).

14. According to 29 C.F.R. § 1601(28)(a)(1), a person may request a notice of right to sue from the Commission after 180 days have passed since the filing of the charge so long as it is "filed against a respondent other than a government, governmental agency or subdivision." In § 1601(28)(d), the regulations dictate that if there has been a dismissal of a charge against a government, governmental agency or subdivision, the Commission will

issue the notice of right to sue. In other cases, the Attorney General will issue a notice of right to sue. *Id.* Because the PHRC has dismissed the charges against the City, and has already issued a right-to-sue letter on Albright's subsequent complaint, Albright should have no problem obtaining a right-to-sue letter from the EEOC on her first complaint.

15. In *Waiters,* the Third Circuit declined to adopt a *per se* rule that all claims of retaliation based on the filing of an EEOC complaint are ancillary to the complaint. *Waiters,* 729 F.2d at 237. The Third Circuit later noted that other courts of appeals have adopted broad per se rules allowing any allegations of retaliatory conduct related to a prior EEOC complaint, and reaffirmed the method of "examin[ing] carefully the prior pending EEOC complaint and the unexhausted claim on a case-by-case basis before determining that a second complaint need not have been filed." *Robinson v. Dalton,* 107 F.3d 1018, 1024 (3d Cir.1997).

er filing of an informal complaint. *Id.* at 235. The case she filed in district court centered around retaliation arising from the earlier complaints, although the events alleged took place after her EEOC complaint had been lodged. *Id.* at 236. Retaliation is similarly at the core of Albright's allegations of discrimination. Thus continued acts of retaliation following the filing of Albright's second EEOC charge are within the scope of the first charge and are properly before this Court.

If anything, Albright has a stronger case for having exhausted her administrative remedies than Waiters did, because all of her claims have been presented to the EEOC. The City relies on *Waiters* and related cases to argue that events subsequent to the filing of Albright's second EEOC charge are not properly before the court because they have not been subjected to administrative exhaustion. (Def.'s Mem. Supp. Summ. J. at 11.) In *Waiters* and *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir.1996), both cited by the City, the plaintiff alleged major incidents and claims that had never been presented to the EEOC.[16] All of the claims Albright made in her third EEOC charge occurred during the pendency of her second EEOC action, because the EEOC did not issue its right-to-sue letter on her second charge until October 27, 2003, over a year after the last

EEOC charge was filed. Again, as with her first EEOC charge, Albright is still entitled to request a right-to-sue letter because a sufficient time period has elapsed.

In sum, none of Albright's Title VII claims are barred from the present action by statute of limitations or procedural defects. The claims in Albright's first EEOC charge are not barred by any statute of limitations because she has not yet received a right-to-sue letter from the EEOC. If she produces such a letter, she may present these claims at trial. The claims in Albright's second EEOC charge are both timely and procedurally proper, because they were filed after exhaustion of the EEOC remedies. The claims in her third EEOC charge are properly before this court because they fall within the scope of the earlier two complaints.[17]

▪ Albright's PHRA claims are also timely, and have satisfied the requirement of administrative exhaustion. A plaintiff claiming discrimination under the PHRA must first file a charge with the PHRC within 180 days. 43 Pa.C.S. § 959(h). Under the statute, Albright clearly may allege any incidents of discrimination unlawful under the PHRA that took place within the 180–day period prior to the filing of any of her three complaints.

---

16. In *Waiters,* the plaintiff raised a retaliatory discharge claim in her federal case arising from events transpiring a year after her first EEOC complaint had been closed. *Waiters,* 729 F.2d at 235. In *Antol,* the plaintiff claimed gender discrimination in his federal case, when his EEOC charge only mentioned disability discrimination. *Antol,* 82 F.3d at 1295. Neither additional claim had been presented to the EEOC. In the present case, Albright has submitted all of her claims to the EEOC, and none of them are time-barred, because she still has not received right-to-sue letters from the EEOC on her first and third charges.

17. There is only one time period in which Albright alleges events that falls outside of the 300–day period prior to each EEOC complaint. Albright's first EEOC complaint was filed on May 11, 2000, whereas her second EEOC complaint was not filed until October 1, 2002. There is a gap of about a year between the filing of her first complaint and the 300–day period immediately prior to the filing of her second complaint: May 2000 through May 2001. Because the events alleged in this later period fall within the scope of Albright's first EEOC complaint, which also alleged racial and gender discrimination and retaliation, those events will also be considered.

These periods are from November 11, 1999 to May 11, 2000; September 5, 2001 to March 5, 2002; and April 1, 2002 to October 1, 2002. A civil action pursuing a claim under the PHRA must be filed within two years after notice from the PHRC that it is closing the complaint. 43 Pa.C.S. § 962(c)(2); *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 471 (3d Cir.2001). In this case, Albright received right-to-sue letters from the PHRC on all three of her charges. (Def.Mem.Supp.Summ. J. Ex. B, C, D.) The first letter is dated July 16, 2002. (*Id.* Ex. B.) Because Albright filed her complaint in this case in federal court on January 22, 2004, well within two years of the first PHRC letter, none of the PHRA claims related to the time periods above are time-barred, and all have satisfied the administrative exhaustion requirements.

Further, all of the discriminatory and retaliatory acts alleged in Albright's second and third PHRC complaints may be argued in support of her PHRA claim, because they are all within the scope of her prior PHRC complaints. Federal and state courts "generally interpret the PHRA in accord with its federal counterparts." *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir.1996). *See also Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083–84 (3d Cir.1995) (noting that the PHRA and Title VII are interpreted similarly); *Chmill v. City of Pittsburgh*, 488 Pa. 470, 412 A.2d 860 (1980) (recognizing precedents suggesting that "the Human Relations Act should be construed in light of 'principles of fair employment law which have emerged relative to the federal [statute] ....'") (quoting *General Elec. Corp. v. PHRC*, 469 Pa. 292, 365 A.2d 649 (1976)). The same logic that supports allowing plaintiffs to plead events that occur subsequent to the filing of an EEOC complaint if they fall within the scope of the earlier complaint applies to claims under the PHRA. Albright properly utilized both state and federal administrative remedies, and is not barred from alleging facts arising after the filing of an administrative complaint if those facts fall within the scope of the original complaint, as they do here.

### a. *Race and Gender Discrimination Under Title VII and the PHRA* [18]

The City claims that it did not discriminate against Albright because of race or sex, because she did not suffer adverse employment actions, and has introduced evidence that Albright did not have significantly less overtime or training than other detectives. Albright has introduced some evidence that she did suffer adverse employment actions because of her race and sex. Therefore there is a material question of fact as to whether the adverse employment actions that Albright alleges did occur. It would be possible for a jury to find that Albright was denied overtime and training opportunities because of her race and/or sex. Thus Albright's discrimination claims under Title VII survive the City's motion for summary judgment.

Albright does not provide any evidence of direct discrimination. Therefore, I evaluate Albright's claims of discrimination under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Kautz v. Met–Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005); *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir.2005).

---

**18.** Because the PHRA is interpreted "in accord with its federal counterparts," including Title VII, I discuss her substantive claims under both statutes together. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir.1996). The rest of my discussion relating to Albright's Title VII claims applies equally to her claims under the PHRA.

Under the *McDonnell Douglas* framework, Albright must first establish a *prima facie* case of discrimination. *Fasold,* 409 F.3d at 184. To show a *prima facie* case of employment discrimination, Albright must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer favored individuals with qualifications similar to Albright's [19] *Sarullo v. U.S. Postal Service,* 352 F.3d 789, 797 (3d Cir.2003). The *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied. *Id.* at 798. According to the Third Circuit, "[t]he central focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." *Sarullo,* 352 F.3d at 798. The plaintiff "must establish some causal nexus between [her] membership in a protected class" and the adverse employment decision. *Id.*

In support of her discrimination claims under Title VII and the PHRA, Albright claims that the City denied her "numerous training and overtime opportunities that were provided to male and white employees." (Pl.'s Resp. to Def.'s Mot. Summ. J. at 16.) The parties do not dispute that Albright satisfies the first two prongs of the prima facie case: she is a member of a protected class and is qualified for the position of police detective. (Def.'s Mem. Supp. Summ. J. at 13.) Instead, the City argues that Albright has not suffered an adverse employment action and that she was not treated less favorably than other similarly-situated non-protected employees. (*Id.* at 13–15). I find that for the purposes of summary judgment, Albright has presented evidence of suffering adverse employment actions, and she has presented some evidence that she suffered these actions under circumstances suggestive of discrimination.

An adverse employment action is one that affects an employee's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). Title VII specifically designates discrimination in training, "including on-the-job training programs" as an unlawful employment practice. *Id.* § 2000e–2(d). Lack of overtime opportunities, which provide significant compensation for many police officers, is a form of reduction in compensation.[20]

---

**19.** Some courts suggest that the fourth factor requires a showing that other similarly situated employees outside of plaintiff's protected class were more favorably treated under similar circumstances. *Sarullo,* 352 F.3d at 797 n. 7. The Third Circuit has explicitly rejected such a requirement. *Id.* Rather, plaintiff must show that the adverse employment action occurred "under circumstances that raise an inference of unlawful discrimination." *Id.* Showing that similarly situated employees outside of plaintiff's protected class were more favorably treated under similar circumstances is one way, but not the only way, to raise an inference of unlawful discrimination.

**20.** Other federal courts in the Third Circuit and elsewhere have assumed that a reduction in overtime is a material adverse action linked to compensation. *See e.g. Bass v. Bd. of County Com'rs, Orange County, Fla.,* 256 F.3d 1095, 1118 (11th Cir.2001) (acts including loss of overtime "which deprived Bass of compensation which he otherwise would have earned clearly constitute adverse employment actions for purposes of Title VII"); *Lidwell v. Univ. Park Nursing Care Center,* 116 F.Supp.2d 571 (M.D.Pa.2000) (reduction in hours constitutes adverse employment action); *Williams v. City of Harrisburg,* 2005 WL 2335131 at *5 (M.D.Pa.2005) (suggesting that firefighter transfer would be an adverse employment action if it resulted in "less opportunity for overtime"); *Hurst v. PNC Bank,* 2004 WL 999759 at *3 (E.D.Pa.2004) (reduction in overtime considered part of prima facie case, subject to rebuttal by defendants).

Therefore, equal opportunities for training and loss of overtime opportunities are well within the ambit of Title VII, provided that they are substantial.

■ Deprivation of training, if necessary for career advancement, may constitute an adverse employment action. At her deposition, Albright stated that she wanted "crime scene training" on subjects such as fingerprinting and terrorism, which would help her with her career. (Albright Dep. at 17–18). Albright named four white detectives whom she said were given this outside training in 1999: Detectives Wilson, McGroty, Bonner, and Horger.[21] (Id. at 18–19). In response, the City notes that in the year 2001, Albright was one of only four detectives in the Southwest Detectives Division to receive crisis training.[22] The City's chart, Exhibit G to the City's motion for summary judgment, is of limited usefulness because it does not explain what the various training notations mean, and gives no indication of which trainings correspond with the "crime scene training" Albright refers to.[23] While Albright has demonstrated that some white detectives received some training that she did not, the City has demonstrated that Albright received some training that other white detectives did not, and that female African–American detectives as a group were more likely to receive training than white male detectives. The City names seventeen white male detectives who did not receive any specialized training at all from 1999–2004. (Def.'s Mem. Supp. Summ. J. Ex. G.) Three out of

the five other African–American female detectives in the unit received specialized training in 1999 and/or 2000. (Id.) In fact, according to the City's chart, thirty-seven out of the seventy-one detectives—over half of them—received no outside training in the period 1999–2000. (Id.) Albright was approved to transfer to both the Homicide and Narcotics Intelligence Units with the training that she did receive. (Albright Dep. at 109–110.)

The city's statistics are an insufficient response to Albright's claim of discrimination. Albright claims that she was denied training that she requested because she was a woman, and she says that men who wanted training were given it. Some detectives on the City's list may not have wanted crime scene training, or may have received it prior to 1999. In fact, Albright first complained about the disparity in training in 1999, at which time she said that the majority of male detectives had received the training she sought; they could have received the training prior to 1999. (See Albright Dep. at 18.) Similarly situated male detectives would be those who needed and requested the training, those to whom Albright was comparing herself. The City's statistics do not entirely disprove Albright's contention that she was deprived of training because she was a woman, because they do not distinguish between those detectives who were similarly situated and those who were not. Therefore, for the purposes of summary judgment, Albright has established an adverse employment action.

21. In the chart of detectives and training provided in 1999 by the City, Detective Wilson does not appear, Detective McGroty received no training, Detective Bonner received hostage training, and Detective Horger received computer and FATS training. Again, there is no explanation of what these trainings are.

22. The City's motion itself states that "in the year 2000, plaintiff was one of only four de-

tectives in SWDD to receive crisis training." (Def.'s Mem. Supp. Summ. J. at 4.) The chart to which the City cites, however, lists Albright and the others as receiving the training in 2001. (Def.'s Mem. Supp. Summ. J. Ex. G.)

23. For example, the City's chart notes that many detectives, including Albright, received "FATS" training, but does not explain what that acronym means.

■ Also, Albright presents sufficient evidence of race or gender discrimination to survive summary judgment with respect to overtime. First, Albright alleges a general lack of overtime for women, an allegation which is belied by the statement provided by the City. In 2000, Albright earned more overtime than eighteen other detectives, including fourteen white male detectives, while nineteen detectives earned more overtime than she did, including two black female detectives. (*See* Def.'s Mem. Supp. Summ. J. Ex. H.) In 2001, Albright earned more overtime than twelve other detectives, including eight white male detectives, while four other black female detectives were among the twenty-five who earned more overtime than she did. (*See id.*) In 2002, despite a three to four month leave of absence from work, Albright earned more overtime than twenty-three other detectives, including fifteen white male detectives, while only sixteen detectives, including three black female detectives, earned more overtime than she did. (*See id.*) In 2003 and 2004, Albright's overtime dropped dramatically. In 2003, only seven detectives earned less than Albright, while twenty-eight earned more. (*See id.*) In 2004, eleven detectives earned less than Albright, and twenty-seven earned more. (*See id.*)

Overall, though, the City cannot disprove Albright's allegations merely by pointing to how much overtime each detective earned. The fourth element of Albright's prima facie case requires her to show that she was denied overtime under circumstances giving rise to an inference of discrimination. Albright sees overtime as an opportunity for earning extra money. Different detectives may have different opinions about overtime. Some detectives at SWDD earned only a few hundred dollars per year in overtime. (*See id.*) Presumably this is their choice. Albright need not show that no detectives earned less than her; rather, she must show that she was deprived of overtime when others who sought it were granted the opportunity to get it.

Albright made such allegations at her deposition: "I tried to go out and serve a search warrant a couple times. They didn't want me to go out and serve it, but they will let a male detective go out and handle my search warrant and they will get the eight hours." (Albright Dep. at 44.) She also stated that Captain Glenn told her she could not do safe streets overtime because she was delinquent in her reports, but "male detectives who were like delinquent delinquent ... they were allowed to do Safe Streets." (*Id.* at 92.) She then named detective Maurizio, who earned significant amounts of overtime, according to the City's records. (*See* Def.'s Mem. Supp. Summ. J. Ex. H.) These statements give some indication that Albright was treated less favorably than the male detectives with respect to overtime opportunities, which are a significant source of compensation for police officers.

The discriminatory statements of Albright's supervisors provide further support for her Title VII claims surviving summary judgment. Albright alleges that Lieutenant Byrne made comments to other detectives that "black females need to be kept in the kitchen making coffee." (Albright Dep. at 20–21.) A captain approached Albright once and told her that Lieutenant Byrne "didn't like black females," and that she should "watch herself." (*Id.* at 21–22.) When Albright was out sick, Lieutenant Byrne posted a memo on the city-wide computer system stating that Albright was on "extended sick leave with a hysterectomy." (Def.'s Mem. Supp. Summ. J. Ex. B.) In response to Albright's complaints about this incident, Captain Glenn told Albright that if she wanted to prove that she did not have a hysterectomy, she could "go out and have a baby." (Albright. Dep. at 31.) While not direct

evidence of discrimination with respect to training and overtime opportunities, stray remarks such as these may be given some probative effect if made by a decisionmaker. *See Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097 (3d Cir.1995). Both Lieutenant Byrne and Captain Glenn made decisions about Albright's training and overtime opportunities. Lieutenant Byrne was in charge of deciding which detectives were sent to which training. (Albright Dep. at 16–17.) Captain Glenn denied Albright overtime opportunities. (*Id.* at 91–93.) Their comments could be some evidence of their underlying prejudices.

For the reasons stated above, deprivation of both training and overtime opportunities can be adverse employment actions, and Albright has alleged that she suffered both under circumstances suggestive of discrimination. Therefore, Albright has presented evidence sufficient to survive summary judgment on her claims that the City engaged in race and gender discrimination against her.

b. *Retaliation Under Title VII and the PHRA:*

█ There are three requirements for establishing a *prima facie* case of retaliation under Title VII. The plaintiff must show: (I) that she engaged in protected activity, (ii) that the employer took adverse action against her, and (iii) that a causal link exists between the protected activity and the employer's adverse action. *See Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir.2001); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir.2000); *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir.1997); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1299 (3d Cir.1997); *Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir.1995).

Albright clearly satisfies the first requirement, having engaged in the protected activity of complaining about what she believed to be unlawful discrimination. Filing a charge with the EEOC or appropriate state agency constitutes protected activity. *See Weston*, 251 F.3d at 430. Internal complaints about discriminatory practices are protected as well. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir.1996). In an action for unlawful retaliation, "a plaintiff need not prove the merits of the underlying discrimination complaint, but only that 'he was acting under a good faith, reasonable belief that a violation existed.'" *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir. 1993) (quoting *Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990)). It is undisputed that Albright made good-faith complaints of discrimination both to her supervisors and to the EEOC. Therefore the first requirement is satisfied.

The Third Circuit has held that the "adverse employment action" element of a *prima facie* case of retaliation "incorporates the same requirement that the retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e–2(a)(1) or (2)." *Robinson*, 120 F.3d at 1300–01. That is, the plaintiff must show an employment action "that is serious enough to alter his or her 'compensation, terms, conditions, or privileges' of employment." *Id.* at 1300. Therefore, retaliatory refusal of training and loss of overtime opportunities must be evaluated by the same standard used to determine whether a discriminatory employment action has occurred.

First, Albright testified at her deposition that after she complained to Captain Glenn about Lieutenant Byrne's hysterectomy posting, Captain Glenn for years would not allow her to work overtime under the Safe Streets program. (Albright Dep. at 89–93). She also testified that Captain Glenn placed her on involuntary restricted duty

for three to four weeks after she refused to go to the firing range because of a "female problem." (*Id.* at 95–96.) Albright was unable to receive overtime while she was on restricted duty. (*Id.* at 97.) Albright attributed her restricted duty status to retaliation by Captain Glenn for her two earlier PHRC complaints. (Def.'s Mem. Supp. Summ. J. Ex. D.) In both of these situations, Albright has introduced some evidence that she lost compensation she otherwise would have been entitled to, satisfying the requirement of an adverse employment action.

Albright also testified to a specific instance of Captain Glenn retaliating against her by refusing to give her training. On May 7, 2002, Captain Glenn gave an order that Albright was not to attend a Police Bureau of Investigations ("PBI") training that she had been scheduled to attend on May 14, telling her that it was cancelled. (Def.'s Mem. Supp. Summ. J. Ex. C.) This training would have allowed her to sit on a disciplinary board of the Police Department. (*Id.*) On May 13, 2002, Albright learned that the PBI training was not canceled, but she was unable to attend due

to the direct order from Captain Glenn. (*Id.*) Again, Albright considered this deprivation to be a clear act of retaliation. (*See* Def.'s Mem. Supp. Summ. J. Ex. D.) Because this training would have qualified Albright to perform job functions she was not at the time qualified to perform, it would affect Albright's employment opportunities. In *Nelson v. Upsala College*, 51 F.3d 383 (3d Cir.1995) the Third Circuit held that an adverse employment action must consist of an employer taking action that adversely affects the plaintiff with respect to the employment relationship, as opposed to engaging in conduct that the employee merely finds objectionable. *Id.* at 387–88. Training that qualifies an employee for substantively different work under that employer, work that she aspires to do, does plausibly affect the employment relationship itself. Here Albright was scheduled to receive the training, and her permission to attend was revoked based on a misrepresentation. Thus Albright has satisfied the requirement of producing some evidence that she suffered an adverse employment action with respect to her training opportunities.[24]

24. Albright alleges many other plausible instances of retaliatory action by her supervisors that fail to rise to the level of an adverse employment action for the purposes of a retaliation claim under Title VII or the PHRA. These allegations include Albright's supervisors failing to transfer her to other units, refusing to speak with her, watching her all day, forcing her to go out on assignments alone, coaching a civilian into making a complaint against her, and making threats and negative comments to her. Under Third Circuit law, direct economic harm may be "an important indicator of a tangible adverse employment action" but "it is not the sine qua non." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir.1999). "If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." *Id.* While loss of training and over-

time opportunities decrease an employee's earning potential, the other actions that Albright alleges do not.

In *Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir.1997), the Third Circuit held that "unsubstantiated oral reprimands" and "unnecessary derogatory comments" do not rise to the level of an adverse employment action for a retaliation claim. *Id.* at 1300. In *Weston*, the Third Circuit expanded on this rule to hold that even in the case of written reprimands, a retaliation plaintiff must show that the reprimands "affected the terms or conditions of his employment." *Weston*, 251 F.3d at 431. Many of the incidents that Albright complains of fall into the categories of reprimands and derogatory comments. Lieutenant Byrne's memorandum alleging that Albright had a hysterectomy (Albright Dep. at 26); Sergeant Nickels and Lieutenant Byrne yelling at her for making mistakes in typing complaints (Id. at 25–28); Captain Glenn tell-

Albright also supplies evidence of causation on her retaliation claims of denial of overtime and training, satisfying the third requirement of the claim. The existence of a causal link between protected activity and an adverse employment action "must be considered with a careful eye to the specific facts and circumstances encountered" and evidence of a causal link may be "gleaned from the record as a whole." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir.2000). In this case, the City's employees, Albright's supervisors, gave her ample indication that they were retaliating against her. In June 2000, after Albright filed her first complaint with the PHRC and the EEOC, Captain Glenn allegedly told her "You hurt my people. I will do what I have to do to hurt you." (Albright Dep. at 31.) When Sergeant McGowan became Albright's supervisor, Sergeant Ryan placed notes in her drawing telling her that Albright was a "problem in the squad." (*Id.* at 78–79.) Some time around 2003, Sergeant Ryan told Albright in front of the squad that she was a trouble maker and said "People like you, we don't need here." (*Id.* at 82.) These statements, especially Captain Glenn's, establish a plausible basis for the adverse employment actions alleged by Albright.

Albright has established a prima facie case of retaliation under Title VII for filing complaints with her supervisors and with the EEOC and PHRC. After making such complaints, Albright alleges that she was subjected to the adverse employment actions of loss of training and overtime opportunities, and has produced evidence suggesting a retaliatory motive for these actions. Therefore, Albright's retaliation claims under Title VII survive summary judgment.

### 2. *Albright's § 1983 Claim*

Albright asserts that the City's alleged retaliatory actions give rise to a claim pursuant to § 1983 for violations of her First Amendment rights. The City argues first that Albright's claims under § 1983 are barred by the statute of limitations. (Def.'s Mem. Supp. Summ. J. at 17–18.) In the alternative, the City argues that Albright fails to establish municipal liability under § 1983. (*Id.* at 18–24.) Finally, the City argues that even if municipal liability is established, Albright's speech was not protected as a matter of law. (*Id.* at 24–27.) Municipal liability is the dispositive ground for granting summary judgment to the City on Albright's § 1983 claim.

Albright claims that the City retaliated against her "in accordance with the [City's] *policy or custom of punishing employees who report wrongdoing.*" (Pl.'s Compl. ¶ 45.) In order to recover under § 1983, Albright must establish that the City (1) while acting under color of state law (2) deprived her of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir.2000). *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) established that a local government may not be sued under § 1983 using a respondeat superior theory. In *Monell* the Supreme Court held that:

---

ing Albright that she could prove she did not have a hysterectomy by "going out and having a baby" (Id. at 31); Sergeant McGowan warning Albright about completing paperwork in a timely manner (Id. at 62–63); Sergeant Ryan placing notes in Sergeant McGowan's drawer telling her that Detective Albright and another woman were "problems in the squad" (Id. at 80–81); and the other incidents which Albright alleges of her supervisors and coworkers alternately ignoring her and yelling at her, all fail to qualify as adverse employment actions under the Third Circuit's standard as set forth in *Robinson*.

[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. *Id.* at 694, 98 S.Ct. 2018. *See also Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1295 (3d Cir.1997) (rejecting city's respondeat superior liability for constitutional torts of its employees). The Supreme Court has recently reaffirmed that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cty. Commissioners of Bryan Cty. v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Thus, local government bodies may only be held liable if a state actor acts unconstitutionally pursuant to a directive, policy or custom instituted by an actor with final authority to speak for the city.

The Third Circuit has defined both "policy" and "custom" in this context. A policy occurs when "a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996) (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990) (citations omitted)). A custom is defined as "such practices of state officials so permanent and well-settled as to virtually constitute law." *Id.* Under either a policy or custom approach, "it is incumbent upon [the] plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews,* 895 F.2d at 1480. Albright has not alleged any "official proclamation, policy or edict" by a decisionmaker with final authority to establish municipal

policy. Nor has Albright introduced any evidence of retaliatory practices that extended beyond the City's behavior toward herself. She has not established municipal liability under § 1983 pursuant to a policy or custom.

■■■■ Next I consider whether Albright has shown municipal liability under § 1983 for failure to train police officers. A municipality may be liable for failure to train its police officers "only where [it] reflects a 'deliberate' or 'conscious' choice by [the] municipality—a 'policy' as defined" in Supreme Court cases. *Brown v. Muhlenberg Tp.,* 269 F.3d 205 (3d Cir. 2001) (*citing City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The scope of liability for failure to train is narrow, and will arise "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197. Albright fails to establish municipal liability for failure to train for the same reasons that she cannot establish a city policy or custom of punishing employees who report wrongdoing. She has not introduced evidence of any widespread behavior on the part of the police, and only alleges retaliation against her own speech.

■■■■ Finally, I consider whether Albright has introduced evidence that any single decision by a policy maker with respect to her is sufficient to support municipal liability under § 1983. The Supreme Court has elaborated on the holding of *Monell* when a plaintiff is alleging a discrete act rather than a widespread policy. In cases of adverse employment actions, liability may attach to a local government when a named official has final policy making authority over the conduct in question. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Andrews v. City of Philadel-*

*phia,* 895 F.2d 1469, 1480 (3d Cir.1990). If the authorized policymakers approve both a subordinate's decision and its underlying basis, "their ratification would be chargeable to the municipality because their decision is final." *Andrews,* 895 F.2d at 1481, (*citing City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)). Identifying the policy-making official is a question of law for the court to decide, not a matter of fact to be submitted to the jury. *Praprotnik,* 485 U.S. at 124, 108 S.Ct. 915.

In *Andrews,* the Third Circuit found the Police Commissioner to be the official policymaker for purposes of determining the City's § 1983 liability in discrimination cases. *Andrews,* 895 F.2d at 1481. The court did not seem to consider the possibility that Police Captains and a Personnel Director could be policymakers. *Id.* at 1480-82. Here, Albright has not provided any support for finding her superiors at Southwest Detectives to be policymakers. Albright alleges that she complained several times to Deputy Commissioner Johnson about the problems she was experiencing at work, and requested a transfer. (Albright Dep. at 120-30.) Albright states that the Police Commissioner makes the final determination as to whether a transfer goes through. (*Id.* at 106.) She also claims that "the Deputy Commissioner has the power to transfer you ... It's just a matter of picking up the phone and saying, 'This person is transferred.'" (*Id.* at 126.) Accepting Albright's statement of the Commissioner's and Deputy Commissioner's power as true, Albright would still have to show that either the Commissioner or the Deputy Commissioner approved the decision of her supervisors and their alleged underlying rationale, retaliation for making complaints.

None of the alleged incidents of retaliation can be attributed to the City through its policymaker the Deputy Commissioner of Police. Albright alleges that the City's agents, police lieutenants, sergeants and captains, retaliated against her filing of complaints by not speaking to her, not giving her partners to go on assignments with, denying her training that she needed for advancement, placing her on restricted duty for three to four weeks in August 2002, yelling at her, and not transferring her to another unit. (*Id.* at 60, 65, 82, 95, 123-26.) The personal conduct of police personnel, such as not speaking to Albright, or yelling at her, cannot fairly be attributed to the Commissioner or Deputy Commissioner of Police under the heightened municipal liability standard of § 1983. Albright does not allege any facts linking these behaviors to a decision of the Deputy Commissioner. Albright stated that she did not receive a memo placing her on restricted duty in 2002, but was only told her status orally. (*Id.* at 95-96.) There is no indication that the upper echelons of the City's Police Department approved Albright's restricted duty status, or that it was ever made official. After Albright reported to the City's medical center, she was sent back to work. (*Id.* at 96.)

The only supervisory "action" that Albright can tie directly to the City is actually an omission: the failure of the City to approve the transfer that she requested. Albright alleges that the Commissioner and the Deputy Commissioner have the power to determine which officers get transferred. (*Id.* at 106, 126.) Albright was approved for a transfer to the homicide unit in 1998, before she ever made any of the complaints at issue in this lawsuit. (*Id.* at 105). The most that these Commissioners can be said to have done is not approve a wholly discretionary transfer. This inaction, unlike approving a demotion, suspension, or termination of an employee, cannot be said to constitute an official condonation of retaliation, especially considering Commissioner Johnson's ex-

pressions of willingness to help Albright transfer. (*Id.* at 126–29). Failing to approve Albright's transfer does not meet the standard for attaching liability to a local government in the case of adverse employment actions articulated in *Pembaur*, which dictated that liability should attach "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292; *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990). As there was no action ordered in the case of Albright's requests to transfer, there can be no municipal liability.[25] Because Albright has failed to establish municipal liability for any alleged actions by her supervisors, her § 1983 claim against the City must fail.[26]

3. *Albright's Claim Under the Pennsylvania Whistleblower Act*

■ The fourth count of Albright's complaint is a claim under the Pennsylvania Whistleblower Act, 43 Pa.C.S. Ch. 25.

The Whistleblower Act makes it unlawful for an employer to subject an employee to adverse employment action because the employee "makes a good faith report … verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste." *Id.* at § 1423(a). The Act allows an employee to bring a civil action for injunctive relief or damages within 180 days after the occurrence of the alleged violation. *Id.* at § 1424(a); *Perry v. Tioga County*, 168 Pa.Cmwlth. 126, 649 A.2d 186, 188 (1994); *O'Rourke v. Pennsylvania Dep't of Corrections*, 730 A.2d 1039, 1042 (Pa.Cmwlth.1999).[27]

The Whistleblower Act only protects against retaliation if the employee "makes a good faith report" to an "appropriate authority an instance of wrongdoing or waste." 43 Pa.C.S. § 1423(a). The Act defines "wrongdoing" as "A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct

---

**25.** This is not to say that inaction could never trigger municipal liability. If a plaintiff were *entitled* to some employment action, such as a benefit of seniority, a raise, or a transfer, failure to grant such action to the plaintiff could conceivably satisfy the *Pembaur* test. In a case such as this one, however, where the plaintiff concedes that the employment action she requests is wholly discretionary, it is inappropriate to consider inaction to be a constitutionally impermissible adverse employment action, especially without any indication of retaliatory intent on the part of the decisionmaker.

**26.** Because Albright's § 1983 claim against the City fails, it is unnecessary to address the availability of punitive damages under § 1983. Although Albright requested punitive damages against the City under § 1983 in her Complaint, she correctly concedes in her Response to the City's Motion for Summary Judgment that such damages are unavailable. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

**27.** The Pennsylvania Supreme Court has not addressed the issue of whether a "continuing violation" can toll the 180–day statute of limitations for the Whistleblower Act. Because this court exercises pendent jurisdiction over this state law claim, we are "required to the extent necessary to our decision to predict how the Pennsylvania Supreme Court would apply" the law. *Surace v. Caterpillar, Inc.*, 111 F.3d 1039 (3d Cir.1997). Because I grant the City's summary judgment motion as to Albright's Whistleblower Act claim on the basis of whether she filed a "good faith report" of "wrongdoing or waste," it is not necessary for me to predict whether the Pennsylvania Supreme Court would allow a continuing violation to toll the 180–day statute of limitations. However, I note that decisions of the Pennsylvania Commonwealth Court explicitly deny equitable discretion in extending the period. *See O'Rourke*, 730 A.2d at 1042 ("this 180–day time limit is mandatory, and courts have no discretion to extend it"); *Perry*, 649 A.2d at 188 ("any contrary interpretation would make this provision meaningless").

or ethics designed to protect the interest of the public or the employer." *Id.* at § 1422. A good faith report is a report of waste or wrongdoing "which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true." *Id.* Albright's initial complaint to her supervisors alleged that she was not getting the training that she wanted, nor were minority or black female officers. (Albright Dep. at 17, 18.) The three complaints dual-filed with the PHRA and the EEOC focus completely on Albright's treatment by her supervisors at the department, and make no mention of the treatment of other employees. There is no doubt that Albright believed that her treatment by the City violated state and federal antidiscrimination laws, or she would not have filed these complaints with her supervisors and the appropriate agencies. But her reports were certainly made with the "consideration of personal benefit" forbidden by the statute.

Albright points to *Podgurski v. Penn. State Univ.,* 722 A.2d 730 (Pa.Super.1998) as illustrative of the broad scope of "wrongdoing" under the statute. In that case, the court held that internal violations of administrative policies such as "expenditures of unnecessary funds, dismissal of workers absent any reason, hiring of workers without proper qualification, false reporting of hours worked, and improper conduct by employees while at work" could constitute wrongdoing under the Whistleblower Act. *Id.* at 732. There is no indi-

cation in *Podgurski* that the plaintiff was motivated by personal gain in reporting these violations, as there is in this case, where Albright was seeking training opportunities.[28] Indeed, the Pennsylvania Supreme Court has described the purpose of the Whistleblower law as not primarily "to punish an employer for harboring retaliatory motives" but instead is "chiefly a remedial measure intended to 'enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing.'" *O'Rourke v. Commonwealth,* 566 Pa. 161, 778 A.2d 1194 (2001) (quoting *Davis v. Ector County,* 40 F.3d 777, 785 (5th Cir.1994)). If Albright's complaints constituted a good faith report for the purposes of the Whistleblower Act, every retaliation claim under Title VII or PHR involving a public employer would trigger the application of the act, clearly not within the plain statutory language excluding "consideration of personal benefit" from protection under the statute.

In short, Albright has not supported her Whistleblower Act claim by showing that she made a good-faith report of wrongdoing under the statute, which is necessary to invoke its protection. Therefore, the City's motion for summary judgment is granted with respect to Albright's Whistleblower Act claim.

**CONCLUSION**

For the reasons stated above, the City's motion for partial summary judgment is granted as to Albright's claims under

---

**28.** I have found no case where a Pennsylvania or federal court has found the filing of a report of discrimination against oneself to be a good faith report of wrongdoing sufficient to trigger protection under the Whistleblower Act. For representative cases, *see Rankin v. City of Philadelphia,* 963 F.Supp. 463 (E.D.Pa.1997) (reporting health and safety violations in city nursing homes); *Podgurski,* 722 A.2d 730 (reporting waste and wrongdoing of co-workers); *Denton v. Silver Stream Nursing and Rehabilitation Center,* 739 A.2d 571 (Pa.Super.1999) (reporting allegations of theft and other wrongdoing to the Department of Health and Human Services); *Rodgers v. Pennsylvania Dep't of Corrections,* 659 A.2d 63 (Pa.Cmwlth.Ct.1995) (reporting fiscal irregularities and "the use of inmates for personal reasons" at a state prison).

§ 1983 and the Whistleblower law. The City's motion is denied as to Albright's claims under the PHRA, and denied in part as to Albright's claims under Title VII. Albright's claims for discrimination and retaliation under Title VII and the PHRA survive summary judgment, on the condition that before trial, she produce a right-to-sue letter from the EEOC on her first charge of discrimination. The City's motion is granted with respect to the availability of punitive damages against the City under Title VII.