Gifford 



 IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-91-094-CV





CITY OF AUSTIN, CHIEF OF POLICE JIM EVERETT,


DEPUTY CHIEF RAYMOND SANDERS, AND CAPTAIN FREDDIE MAXWELL,




 APPELLANTS


vs.




EARL J. GIFFORD,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT



NO. 417,095, HONORABLE JERRY DELLANA, JUDGE PRESIDING



 





 We are asked to review a judgment rendered in favor of appellee Earl Gifford in
a disability-discrimination lawsuit against appellants City of Austin, Jim Everett, Raymond
Sanders, and Freddie Maxwell. After trial to a jury, Gifford was awarded actual damages of
approximately $74,000, prejudgment interest, and attorney's fees in the amount of $18,900. In
addition, the trial court's judgment ordered the City to reinstate Gifford to a position financially
commensurate with his former position and to pay "front pay" until the time of his reinstatement,
for a maximum of two years.

 The appellants have brought twelve points of error in which they challenge the
sufficiency of the evidence supporting the following jury findings: (1) Gifford was disabled pursuant to the Commission on Human Rights Act; (1) (2) the City of Austin and the named
appellants were liable for payment of Gifford's back wages; and (3) the individual appellants were
liable for payment of Gifford's attorney's fees. The appellants also complain of the trial court's
determination that Gifford be reinstated to a position with the City of Austin, that he be paid front
pay until such reinstatement occurred, and that Gifford be allowed to amend post trial his
pleadings to request prejudgment interest. We will affirm in part and reverse in part.



THE CONTROVERSY



 This lawsuit arises from the discharge in October 1985 of a municipal employee
with a hearing impairment. Earl Gifford worked as a jailer in the Austin Police Department from
1974 until 1981, during which time he was promoted to the position of lead jailer. During his
tenure, Gifford received merit pay increases for each year that he worked at the jail. 

 In 1981 he quit his job to complete his undergraduate degree. In 1984 he sought
reemployment with the City and was again hired as a jailer. The testimony at trial reveals that
in 1984 the primary duties of a jailer consisted of staffing one of three separate duty stations: 
(1) the "booking desk" where prisoners were initially admitted to the facility; (2) the jail-cell area
in which the prisoners were detained; and (3) the jail information desk, a place where the
prisoners could meet with their legal counsel and other visitors outside of the jail proper. The
jailers rotated among these various positions. Gifford had staffed the information desk and had
served in the jail-cell area, but had never manned the booking desk during either of his periods
of employment as a jailer.

 In 1984 Gifford approached the lead jailer to ask to be exempted from working at
the booking desk. This particular duty station involved obtaining detailed biographical
information from the prisoners, and Gifford was concerned that the background noise might
interfere with his recording the necessary information. The record indicated that working at the
booking desk subjected a jailer to a myriad of loud noises: simultaneous conversations between
prisoners and officers; the sound of typewriters being used to process detainees; and the noise
caused by the use of pneumatic tubes (not unlike those used at bank "drive-throughs") to dispatch
prisoners' paperwork. Gifford used a hearing aid to compensate for his hearing impairment, but
felt that the ambient noise at the booking desk might interfere with his performance of his duties. 
Consequently, he requested to work in the jail-cell area itself, an area in which he had numerous
years of experience.

 The lead jailer was amenable to Gifford's request but asked Gifford to document
his reasons for seeking an exemption from duty at the booking desk. Testimony suggests that the
lead jailer sought this written explanation to defuse potential criticism from other jailers, not to
justify the exemption itself. Accordingly, Gifford wrote a memorandum detailing his difficulties
when working at the booking desk.

 Eventually the memorandum reached Captain Freddie Maxwell, who approved the
exemption but raised questions concerning Gifford's ability to perform safely his duties in the jail-cell area. His underlying concern appeared to have been that Gifford's continued employment
might subject the City to potential liability. He asked Gifford to have his hearing tested.

 The audiologist's written analysis concluded that Gifford could hear particular
sounds, even those sounds uttered within the confines of a noisy background, but that he might
not completely understand all of the actual words spoken in such an environment. Based in part
upon the audiologist's findings, the appellants decided that Gifford could no longer work as a
jailer. They informed Gifford of their decision and told him to seek work elsewhere. They also
indicated that they would allot him time to locate another position and would provide him with
job-seeking skills.

 Gifford searched for alternative employment but was unsuccessful in locating a
position providing similar pay. In July 1985, approximately one year after the police department
obtained the audiologist's report, Gifford was transferred out of the jail-cell area to the jail
information desk. He was given sixty days to find another position and was fired at the end of
this period. Subsequently, he filed suit pursuant to the Human Rights Act, alleging wrongful
termination because of his hearing disability. The City and the other named appellants appeal
from a judgment favorable to Gifford.



THE APPLICABLE LAW



 The Human Rights Act has as its express purpose "the execution of the policies
embodied in Title VII of the federal Civil Rights Act of 1964, as amended (42 U.S.C. Section
2000e et seq.)." (2) Human Rights Act § 1.02(1). Our state supreme court has observed that one
of the purposes behind this act is the "correlation of state law with federal law in the area of
discrimination in employment." Schroeder v. Texas Iron Works, Inc., 813 S.W.2d 483, 485 (Tex.
1991). When reviewing a case brought pursuant to the Human Rights Act, a court may look not
only to the relevant provisions of the state statute, but when necessary, also to the analogous
federal provisions contained in Title VII. See generally Eckerdt v. Frostex Foods, Inc., 802
S.W.2d 70, 72 (Tex. App. 1990, no writ) ("The stated purposes of the Texas act suggest that the
state legislature intended it to conform to the policies contained in the federal act; therefore we
may consider how the federal act is implemented under clauses similar to those at issue in the
Texas act."). The federal decisions interpreting Title VII may provide guidance as well. Speer
v. Presbyterian Children's Home & Serv. Agency, No. 1211-CV (Tex. App. Dallas, Sept. 23,
1991, motion for reh'g pending) ("Because Texas has little case law interpreting and applying the
[Human Rights] Act, we look to federal case law when appropriate.").



DISCUSSION



 Gifford's claim arose pursuant to the statutory section addressing discrimination
by an employer: "[I]t is an unlawful employment practice for an employer: (1) to . . . discharge
an individual . . . because of handicap." (3) Gifford filed suit under section 7.01 of the Act, which
allows for an aggrieved party to sue once particular administrative actions are completed. See
Human Rights Act § 7.01(a). His judgment was based upon the section of the Act allowing for
equitable relief, which may include but is not limited to, an award of back pay. See id. The trial
court awarded front pay, reinstatement to a commensurate position, attorney's fees, and
prejudgment interest; much of this appeal challenges the propriety of these awards. 

 In eleven of their twelve points of error, the appellants challenge the legal and
factual sufficiency of the evidence supporting the trial court's judgment. In the remaining point
of error, the appellants challenge the trial court's decision to allow a post trial amendment of
Gifford's pleadings to request prejudgment interest. We first set forth the relevant appellate
standards by which we review the evidentiary points.



Standard of Review.


 The appellants have alleged alternatively that no evidence, or factually insufficient
evidence, supports the adverse jury findings. When reviewing a "no evidence" point, we consider
only the evidence and inferences tending to support the finding of the trier of fact, and we
disregard all evidence and inferences to the contrary. Alm v. Aluminum Co. of Am., 717 S.W.2d
588, 593 (Tex. 1986). When reviewing an "insufficient evidence" point, we consider all of the
evidence in the record, including any evidence contrary to the judgment. Plas-Tex, Inc. v. U.S.
Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.
1965). We must determine whether the evidence supporting the finding is clearly wrong and
manifestly unjust. Cain v. Bain, 709 S.W.2d 175 (Tex. 1986); Garza, 395 S.W.2d at 823; In re
King's Estate, 244 S.W.2d 660, 662 (Tex. 1951).



Is Gifford Handicapped under the Act?


 In points one and two, appellants complain that there is no evidence, or insufficient
evidence, to support the jury's determination that Gifford's hearing impairment was generally
perceived to limit severely the performance of work-related functions. They argue that Gifford's
hearing impairment did not rise to the level of a "handicap" as that term was defined in the Human
Rights Act. See Chevron Corp. v. Redmon, 745 S.W.2d 314 (Tex. 1987). We disagree.

 At the time of Gifford's discharge, the Human Rights Act specifically included
"hardness of hearing" as a possible handicap, suggesting that an individual who is not deaf but
is hard of hearing may be found to be handicapped under the statute. (4) "The question of whether
a person is `handicapped' is generally a question of fact for the factfinder." Chevron, 745
S.W.2d at 318.

 The record supplies sufficient evidence on which the jury may have based its
finding that Gifford was handicapped: (1) the audiologist's report of Gifford's "severe to
profound sensorineural hearing loss bilaterally"; and (2) expert testimony from an advocate of
disabled citizens that a person so afflicted is frequently perceived to be unable to perform regular
job duties. This evidence defeats appellants' "no evidence" challenge and adequately supports the
jury's finding that Gifford was "handicapped" under the Human Rights Act. We overrule the first
two points of error.



Motivation for Gifford's Discharge.


 Points of error three and four challenge the legal and factual sufficiency of the
evidence supporting the jury's finding that Gifford was discharged because of his disability. We
understand the appellants' argument to be that Gifford was fired because of his inability to
perform his particular job functions, not because of his disability. The record is replete with
evidence to defeat that contention.

 Gifford's work history was satisfactory, if not exemplary. Fellow jailers testified
that (1) he was a good jailer; (2) he was more alert than other jailers and conducted more frequent
inspections of the detainees; and (3) he had on one occasion used extra-aural sensations to detect
that a prisoner was in danger when other jailers remained oblivious. Moreover, Gifford continued
to work in the jail without incident for almost a year after his supervisors notified him of their
concerns about his ability to perform his duties safely. Additional testimony showed that the
motivation for removing Gifford was concern for minimizing the City's potential liability, not
concern for his alleged inability to perform his duties. This evidence defeats the "no evidence"
challenge and is sufficient to support the jury's finding that Gifford was discharged because of his
disability. We overrule points of error three and four. 



The City's Liability for an Award of Back Pay.

 In their fifth point of error, appellants complain of the award of $73,794.80 in back
wages. Appellants insist that the evidence is legally insufficient to support the jury's finding. We
understand their argument to be that any award of back wages was improper.

 The Human Rights Act specifically allows for back pay: "Additional equitable
relief may include but is not limited to:  (1) the hiring or reinstatement, with or without back
pay." Human Rights Act § 7.01(d)(1). We have already determined that the evidence was
sufficient to support the jury's findings that Gifford was disabled and that he was discharged on
that basis. Because the statute expressly authorizes back pay under such circumstances, the
evidence necessarily supports the jury's award. The fifth point is overruled. 

 Appellants argue in their sixth point of error that even if the evidence is legally
sufficient to support the award of back pay, that same evidence is factually insufficient to support
an award of approximately $74,000 dollars. In fact, say appellants, the evidence shows that
Gifford's award is clearly excessive. Their argument addresses not only the evidentiary issue,
but also the trial court's denial of appellants' motion for leave to enter a trial amendment by which
they hoped to introduce evidence that Gifford had not mitigated his damages. Appellants claim
that the court erroneously overruled their motion. As a result, they were unable to present
evidence of Gifford's failure to mitigate.

 We first address the trial amendment. Initially we note that none of appellants'
points of error speak to this issue. Regardless, we are unable to locate in the record any reference
to the particular motion complained of or any order overruling it. "The burden is on the
appellant, or other party seeking review, to see that a sufficient record is presented to show error
requiring reversal." Tex. R. App. P. Ann. 50(d) (Pamph. 1991). Appellants have, therefore,
waived any complaint as to their motion to amend.

 We turn to the factual-sufficiency challenge. The record indicates that Gifford
earned approximately $7.82 per hour when terminated. There is testimony that, using the $7.82
figure as a base wage, Gifford's back pay amounted to $78,000. If Gifford's base hourly wage
were subjected to any merit increases, the back pay would increase to approximately $86,000. 
Appellants' counsel did not object to this testimony. In addition, an exhibit detailing the specific
calculations was also admitted into evidence, again without objection. 

 Gifford testified at trial that he had received approximately $4,000 as
unemployment compensation after his discharge from the City. In addition, he stated that he had
earned approximately $400 while working as a substitute teacher. Because the Human Rights Act
explicitly requires that "interim earnings . . . shall operate to reduce the back pay otherwise
allowable," these earnings must necessarily offset any back pay award. See Human Rights Act
§ 7.01. Evidence of $78,000 in back pay less an offset of $4400 supports the jury award of
$73,974.80. 

 Appellants have directed our attention to evidence that the City offered Gifford
alternative employment. That evidence suggests that Gifford was offered a custodial position, and
that it paid approximately $1.00 per hour less than the jailer position. They contend that because
Gifford was offered alternative employment with the Police Department, his back pay award
should have been reduced by the amounts he would have earned had he accepted that employment.

 Appellants have cited no case law holding that a claimant under the Human Rights
Act must accept alternative employment that pays less and constitutes a demotion. Nor have we
uncovered any relevant authority in the state's jurisprudence. In Brady v. Thurston Motor Lines,
Inc., 753 F.2d 1269, 1274 (4th Cir. 1985), the federal court stated that "for a Title VII claimant
to fulfill his duty to mitigate damages, it is clear that he need not go into another line of work,
accept a demotion, or take a demeaning position." To the extent that the Human Rights Act may
require the mitigation of damages, we believe this rule to be applicable. Gifford was offered the
position of "Store Specialist," a position paying approximately thirteen percent less than his jailer
salary. Further, the position offered no room for advancement. This evidence, taken in
conjunction with the rule just stated, leads us to conclude that the jury findings were not so
manifestly unjust or clearly wrong as to warrant reversal. Appellants' sixth point is overruled.



Individual Liability for Back Wages.


 In points of error seven and eight, Police Chief Everett, Deputy Chief Sanders, and
Captain Maxwell assert legal and factual sufficiency challenges to that portion of the judgment
imposing on them joint and several liability for Gifford's award of back pay. (5) The appellants
maintain that they were sued in a representative capacity; Gifford maintains that they were each
sued in their individual capacity.

 We determine that even if Gifford sued appellants in their individual capacities,
they are not liable for damages because, under the express terms of the Human Rights Act,
employers may be liable for an unlawful employment practice. The Act does not create a cause
of action against supervisors or individual employees. See Human Rights Act §§ 5.01-.07 (Supp.
1992). The purpose of the Human Rights Act is to execute the policies of Title VII; we note a
long line of federal cases which hold that Title VII creates a cause of action against employers,
but not against supervisors or public officials in their individual capacities. See, e.g., Clanton v.
Orleans Parish School Board, 649 F.2d 1084, 1098-99 (5th Cir. 1981); Harvey v. Blake, 913
F.2d 226, 227 (5th Cir. 1990). (6)

 As a matter of law the Human Rights Act creates a cause of action only against
Gifford's employer, the City of Austin, not against its employees, Police Chief Everett, Deputy
Chief Sanders, and Captain Maxwell. We sustain point of error seven and need not consider the
eighth point.



Attorney's Fees.


 In their ninth and tenth points of error Everett, Sanders and Maxwell challenge the
legal and factual sufficiency of the evidence supporting the judgment imposing on them liability
for attorney's fees. The assessment of liability for attorney's fees was erroneous as a matter of
law because, as we have just concluded, the Human Rights Act does not create any cause of action
against supervisors or employees in their individual capacities. The award of attorney's fees
against Everett, Sanders and Maxwell is insupportable in the absence of any cause of action
against them under the Act. We sustain the ninth point of error and need not reach the tenth
point.



Prejudgment Interest.


 In their eleventh point of error, the appellants attack the trial court's decision to
permit Gifford to file a post verdict amendment requesting prejudgment interest. Appellants
advance three reasons why the trial court erred: (1) Gifford failed to request for prejudgment
interest in his original petition; (2) the court abused its discretion in granting the amendment
because Gifford failed to exercise due diligence; and (3) the Human Rights Act does not expressly
provide for the payment of prejudgment interest.

 As to the first two grounds, a trial court may choose to grant leave to file a post
verdict trial amendment. See Tex. R. Civ. P. Ann. 63, 66. (Supp. 1991). A trial court has no
discretion to refuse an amendment unless: (1) the opposing party presents evidence of surprise
or prejudice; or (2) the amendment asserts a new cause of action or defense, and thus is
prejudicial on its face, and the opposing party objects to the amendment. See Greenhalgh v.
Service Lloyds Ins. Co., 787 S.W.2d 938, 939 (Tex. 1990). There is no evidence of surprise or
prejudice. Nor can we say that the court abused its discretion in granting the amendment.

 A more intriguing question is raised by the City's third argument:  May the City
of Austin be held liable for prejudgment interest? A municipality can be held liable for an
equitable award of back pay and such additional equitable relief as may be appropriate. See
Human Rights Act § 7.01(c) (emphasis added). But is prejudgment interest "equitable relief" and
was it appropriately awarded? 

 We have found no Texas cases addressing this issue so again we turn to federal
cases for guidance. Title VII, like the Human Rights Act, provides for back pay "or any other
equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g) (1988). Federal
appellate courts have approved the award of prejudgment interest as compensation to victims of
employment discrimination. See, e.g., Pegues v. Mississippi State Employment Service, 899 F.2d
1449, 1453 (5th Cir. 1990) ("We have stated in this Circuit that under Title VII interest is an item
that should be included in back pay to make a victim whole"); Sellers v. Delgado Community
College, 839 F.2d 1132, 1140 (5th Cir. 1988).

 We choose to do the same. The Human Rights Act explicitly states that its purpose
is the execution of Title VII's policies. These policies allow for prejudgment interest. Therefore,
we interpret the Human Rights Act to allow an award of prejudgment interest. (7) Appellants'
eleventh point is overruled.



The Award of "Front Pay."

 In their twelfth point of error, the appellants take issue with the award of "front
pay." The judgment provided that Gifford was to be paid $323.60 per week until he was
reinstated to a commensurate position. These payments were to continue for a maximum of two
years. Appellants complain that the Human Rights Act does not explicitly allow for the recovery
of front pay.

 The Act does expressly allow for a claimant's reinstatement or rehiring. It also
expressly allows for awards of back pay. Although the Act does not literally mention the term
"front pay," the Act does allow the court to order appropriate equitable relief. See Human Rights
Act § 7.01(c)(d). The question, then, is whether front pay is appropriate.

 Again, we have found no Texas cases that squarely address this issue. (8) However,
federal cases do permit awards of front pay to Title VII claimants, even though Title VII itself
makes no specific allowance for front pay. See, e.g., Carter v. Sedgwick County, Kan., 929 F.2d
1501, 1505 (10th Cir. 1991); Johnson v. Chapel Hill Indep. Sch. Dist., 853 F.2d 375, 382 (5th
Cir. 1988). Because one of the purposes behind the Human Rights Act is the correlation of state
law to its federal counterpart, we hold that a trial court's award of front pay constitutes a
legitimate exercise of its equity powers. Appellants' twelfth point is overruled.



CONCLUSION



 We reverse that portion of the judgment that awards Earl J. Gifford back pay,
costs, and attorney's fees against Police Chief Jim Everett, Deputy Chief Raymond Sanders, and
Captain Freddie Maxwell. We render judgment that Earl J. Gifford take nothing on his claims
against Police Chief Jim Everett, Deputy Chief Raymond Sanders, and Captain Freddie Maxwell. 
In all other respects, the judgment of the trial court is affirmed.



 Bea Ann Smith, Justice

[Before Justices Powers, Jones and B. A. Smith]

Affirmed in Part; Reversed and Rendered in Part

Filed: February 5, 1992

[Publish]

1. 

 [1] Commission on Human Rights Act, Tex. Rev. Civ. Stat. Ann. 5221k (1987 & Supp.
1992) ("Human Rights Act"). The version of the statute in effect when Gifford's action arose
is found at 1983 Tex. Gen. Laws, 1st C.S., ch. 7, at 37 (Tex. Rev. Civ. Stat. Ann. 5221k,
since amended). Unless otherwise noted, however, references in this opinion are to the
current statute.
2. The United States Supreme Court has identified a two-fold purpose behind Title VII's
enactment: (1) eliminating employment discrimination, and (2) allowing the aggrieved party to
be made whole for those injuries suffered on account of unlawful employment discrimination.
See Albemarle Paper Co. v. Moody, 422 U.S. 405, 417-18 (1975).
3. At the time of Gifford's discharge, the Human Rights Act spoke in terms of "handicap."
See Human Rights Act, 1983 Tex. Gen. Laws, 1st C.S., ch. 7, at 45 (Tex. Rev. Civ. Stat.
Ann. 5221k, § 5.01(1), since amended).
4. See 1983 Tex. Gen. Laws, 1st C.S., ch. 7 at 40 (Tex. Rev. Civ. Stat. Ann. 5221k,
§ 2.01(7)(A),(B), since amended). 
5.   In points of error seven through ten, the appellants have brought forward challenges to
the sufficiency of the evidence supporting their individual liability for awards of backpay and
attorney's fees. But their argument in support focuses, among other things, upon the legal
capacity in which they were sued. We have assumed a liberal stance in reviewing these points
of error, and will pass on their merits in light of their supporting arguments. See O'Neil v.
Mack Trucks, Inc., 542 S.W.2d 112, 114 (Tex. 1976), mandate reissued, 551 S.W.2d 32 (Tex.
1977).
6. Gifford has cited to Hamilton v. Rogers, 792 F.2d 439 (5th Cir. 1986), in support of his
proposition that individual employees who discriminate are personally liable along with the
employer. At first glance, the case does seem to add support for Gifford's argument that the
named appellants are individually liable for back pay. Further scrutiny of the relevant Title
VII law, however, indicates otherwise. 


 In Hamilton, a City of Houston fireman had sued the Fire Department and his
supervisors, C.L. Wilford, and C.P. Nelson, alleging racial discrimination. The district court
held the Houston Fire Department and the individual supervisors jointly and severally liable
for the payment of back pay and compensatory damages. The Fifth Circuit agreed. But, in
Harvey v. Blake, the Fifth Circuit reviewed its holding in Hamilton and noted that in the
earlier decision it had failed to make the distinction between a supervisor's official and
unofficial capacity. The court held that to the extent its ruling in Hamilton conflicted with the
rule established in Clanton v. Orleans Parish (that public officials may be liable for back pay
under Title VII in their official capacity only), Hamilton is nonauthoritative. See Harvey, 913
F.2d at 228 n.2. So it is that Gifford's reliance on Hamilton is misplaced.
7. We are aware that only recently this court has, in two separate cases, denied the award
of prejudgment interest against a unit of government. In Texas Dept. of Mental Health and
Retardation v. Petty, 817 S.W.2d 707 (Tex. App. 1991, writ requested) and University of
Texas v. Hinton, No. 3-90-226-CV (Tex. App.--Austin, Dec. 11, 1991, n.w.h.), we
disallowed awards of prejudgment interest within the context of suits filed pursuant to the
Texas Torts Claims Act. Tex. Civ. Prac. & Rem. Code Ann. §§ 101.001-.109 (1986 & Supp.
1992). Those causes involved situations wherein the recovery of the requested prejudgment
interest would have caused the award against the State to exceed express statutory limits. See
id. at § 101.023. Under the holding of Weller v. State, 682 S.W.2d 234 (Tex. 1984), such an
award would be impermissible. Our understanding is that, within the context of the Tort
Claims Act, the State's waiver of its sovereign immunity extends only as far as the statutory
liability limits set out in § 101.023.


 A different set of circumstances confronts us today. The Human Rights Act allows
for suit to be filed against political subdivisions, to include municipalities. Further, recovery
in the form of back pay and other equitable relief is clearly permitted under the Act's express
terms. Unlike the Tort Claims Act, this statute does not prescribe particular dollar limits to
liability, the effect of which would be to preclude recovery past those limits. Thus an award
of prejudgment interest under the Human Rights Act violates no demarcation of the
government's sovereign immunity.
8. Central Power & Light Co. v. Caballero, 804 S.W.2d 534 (Tex. App. 1990, writ
granted) addresses a similar issue, but yields no light on our specific inquiry. In Caballero, an
employee brought suit under the Human Rights Act, and, after trial to a jury, was awarded
$30,000 in back pay, $200,000 for loss of future earnings, and $15,000 in attorney's fees. 
Appeal was taken on numerous points of error. The court of appeals reversed and remanded,
in part due to the fact that the terms of the Act authorize a court, not a jury, to grant equitable
relief (in Caballero, the jury had determined the awards of loss-of-past earnings, loss-of-future
earnings, and attorney's fees). The appellate court noted that an award of back pay was
expressly authorized by statute and that loss of past earnings certainly equated to back pay. 
But the court was concerned that an award of loss-of-future earnings was not expressly
authorized under the statute.


 In the instant case, however, the court determined that an award of front pay was
appropriate. The court did not award Gifford any loss of future earnings. The front pay
calculation of $323 a week is roughly equal to Gifford's weekly salary at his hourly wage at
the time of discharge. Further, this award was to terminate, in any event, at the conclusion of
two years or at the time of Gifford's reinstatement. We believe these facts sufficiently
distinguish Caballero.