# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00466-CV

**Texas Department of Public Safety, Appellant**

**v.**

**Thomas Williams, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-05-003758, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellee Thomas Williams brought suit against the Texas Department of Public Safety ("the Department") for discrimination on the basis of race and employment retaliation under the Texas Commission on Human Rights Act (TCHRA). *See* Tex. Lab. Code Ann. §§ 21.051-.556 (West 2006 & Supp. 2009). Following trial, the jury found that the Department had retaliated against Williams for engaging in a protected activity and awarded back pay, front pay, and compensatory damages for mental anguish. The Department appeals, arguing (1) that the evidence was insufficient to show that Williams suffered an adverse employment action, (2) that the evidence was insufficient to support the jury's awards of front and back pay, and (3) that the court abused its discretion in admitting the report of an internal affairs investigation prompted by Williams's complaints and the letter of determination Williams received from the EEOC. We affirm the judgment of the trial court.

## BACKGROUND

After serving in the military during Operation Desert Storm and spending two years as a patrol officer in El Paso, Williams entered the Department's academy in 1995 and began working as an officer for the Department in October 1996.[1] Williams spent more than four years as a highway patrol officer in Bayview before being promoted to the rank of sergeant in 2001 and assigned to the narcotics division in Alpine. During his service, Williams was twice given temporary assignments on the Governor's Protective Detail (GPD or "the Detail"), a unit made up of sergeants tasked with ensuring the personal protection of the Texas First Family and visiting dignitaries. After making a favorable impression on Governor Rick Perry during his second temporary assignment, Williams was invited to join GPD by Lieutenant Robert Rodriguez, the Detail leader at that time, in December 2001. After submitting an application for the position and consenting to a background check, Williams was formally offered a position with GPD. Williams testified that his reasons for seeking the position with GPD were both job-related as well as personal. According to Williams, he had heard about the "excellent benefits" of serving on GPD, including specialized training, the opportunity to attend dignitary protection school, and "unlimited amounts of overtime." Further, the position would allow him be closer to his wife and two children by relocating them to Austin. (Williams's family had remained in Houston while he was stationed in Alpine, as Williams stated that he did not intend to permanently settle in Alpine.)

Williams began service with GPD in January 2002 and was permanently assigned to GPD after completing an initial 90-day probationary period. Williams received positive

---

[1] The facts recited herein are taken from the testimony and exhibits admitted at trial.

performance reviews during his first year with GPD. The mid-term assessment of his performance through June 2002 indicates that Williams "is representing the Department of Public Safety at the highest levels of both the State and National Governments" and that he "has performed his duties in a highly professional manner." The assessment also reflects "[n]o [performance] deficiencies at this time." Williams's full-year performance evaluation at the end of 2002 noted his "highly professional manner" as well as his "positive attitude," and also indicates no performance deficiencies. He also took advantage of the abundant overtime opportunities available with GPD, earning $16,183 in overtime pay for the year.

However, by the winter of 2002, Williams had developed concerns about GPD's treatment of African-Americans and women. Specifically, Williams testified that African-Americans and women on GPD were being denied opportunities to accumulate training and overtime. In addition, Williams observed that qualified African-Americans and women who applied to GPD were not being hired due to their race or sex.[2] Williams voiced his complaints to his immediate supervisors and to Captain Chris Mashburn of the Department's Audit Inspection Service, who conducted an internal investigation. The investigation concluded that GPD "was found to be operating ineffectively and inefficiently" due to "a lack of adequate supervision." The report noted that hiring procedures had been ignored as Rodriguez, "[t]he Detail leader, . . . personally chose

---

[2] Williams testified that as of June 2003 there were three African-Americans and one woman serving with GPD. Since that time, Williams and one other African-American sergeant have left GPD. As of the start of trial in February 2008, there was one African-American and one woman among the roughly 25 members serving on the Detail.

3

prospective Detail agents" "without regard to established policy, review, or criteria." In the wake of the investigation, Rodriguez was replaced as Detail leader by Lieutenant David Armistead.

Williams testified that, after Mashburn's investigation, his overtime was cut and he was denied desirable assignments and opportunities for training. In June 2003, Williams sent two memos to Armistead. The first memo, which was also recorded as an EEO complaint alleging racial discrimination, summarized complaints of other African-American sergeants on GPD regarding lack of travel and overtime opportunities. The memo also detailed Williams's own lack of assignments involving travel and "body" duty.[3] The second memo detailed complaints against another sergeant on GPD, including allegations that the sergeant had sexually harassed a female trooper working for the Department.

After Williams submitted his memos, the number of negative write-ups and critiques he received from his supervisors increased dramatically.[4] Williams's mid-term assessment in June 2003 (dated September 18, 2003) indicates that he "performs his duties in an acceptable manner" but notes that he had been involved in a "preventable fleet collision," which according to Williams occurred when the door of his vehicle was damaged as he tried to park close to plant holders made of brick and cement on the grounds of the governor's mansion.[5] Williams was formally written up for working more than sixteen hours in a 24-hour period in September 2003 and

_____

[3] Body duty involves "shadowing" the governor in order to provide immediate protection or alert other GPD sergeants to a change in the governor's plans.

[4] The record reflects no negative write-ups or critiques prior to Williams's sending the memos to Armistead.

[5] Williams testified that other GPD sergeants were written up for fleet collisions after more serious incidents, such as traffic accidents.

for discussing personnel and scheduling matters with the GPD Captain without discussing them first with Armistead, the GPD Lieutenant, in October 2003. Armistead also kept a file of notes detailing other of Williams's activities, including "documenting schedules/travels to cause problems" and "visiting" other African-American members of the Detail to discuss disparate treatment based on race. More than ten such notes from the fall of 2003 were admitted into evidence, along with several pages of notes taken during meetings between Williams and Armistead during which Williams's performance was discussed.

In addition, Williams testified that he was given more "midnight" or "graveyard" shifts, shifts that were considered particularly undesirable due to their late hours, after he made his complaints.[6] He also testified that his overtime opportunities further decreased. Williams's payment records indicate that he made $9,346 in overtime pay in 2003, almost $7,000 less than he had made in 2002.

On January 7, 2004, Williams was involuntarily transferred back to the narcotics division. Williams was not given a specific reason for the transfer, as he was told only that the move was made "for the betterment of the Department." However, when interviewed by a federal investigator who was considering Williams for a Secret Service position, Armistead indicated that the transfer was made due to "personality conflicts" between Armistead and Williams and because

---

[6] According to Williams's testimony, he received more midnight shifts than other GPD sergeants, being assigned his third shift of 2003 when roughly nine other sergeants had worked only one during that year. At one point, Williams was put on midnight duty, running from 10 p.m. to 6 a.m., for fourteen consecutive nights.

of Williams's filing of "multiple EEO and harassment [complaints] against [Armistead] and members of [GPD]."

After the transfer, Williams filed complaints with the Department's Internal Affairs division and the Equal Employment Opportunity Commission (EEOC). After receiving a right-to-sue letter from the EEOC, Williams brought suit against the Department for racial discrimination and retaliation under the TCHRA. At trial, Williams offered evidence of the impact of his transfer from GPD to the narcotics division. Williams's dress changed, from the jacket and tie he had worn during his time with GPD back to standard police attire, and instead of driving a well-appointed car provided by the government, he drove a less luxurious vehicle. He also testified that travel opportunities with the narcotics department were few and travel pay subject to stringent limits, whereas on GPD opportunities for travel were abundant and travel pay and expenses virtually unlimited. Williams testified that GPD was regarded as an elite and specialized unit within the Department, a contention the Department challenged at trial. Further, while his rank and base pay were unaffected by the transfer, the amount of money he was able to earn in overtime decreased due to lack of opportunity. While Williams made $16,813 in overtime pay in 2002 and $9,346 in 2003, after his transfer from GPD to the narcotics division his overtime pay dipped to $4,669 in 2004, $2,540 in 2005, and $84 in each of 2006 and 2007.

Regarding the precise amount of money lost by Williams due to lack of overtime opportunities after his transfer, Williams presented the testimony of Dr. Robert Glover, who testified regarding the amounts of overtime earned by other GPD employees. Glover testified that the total amount of overtime pay for GPD employees rose each year between 2004 and 2007, with the total

6

overtime paid in 2007 reflecting a 99 percent increase over 2003. Though overtime expenditures essentially doubled during this time period, the number of eligible employees remained relatively stable, increasing only from 20 in 2003 to about 25 in 2008. Glover also examined evidence of the overtime earnings of three GPD members who joined GPD at roughly the same time as Williams. From 2004 to 2007, the low earner in the group earned an average of $20,181 in overtime per year, the middle earner earned an average of $25,381 per year, and the high earner earned an average of $34,214 per year, with a single-year high of $36,389.

At the conclusion of the trial, the jury concluded that the Department had retaliated against Williams for engaging in a protected activity. The jury awarded $128,316 in back pay for the four years and two months between Williams' transfer and the trial in March 2008, an amount translating to a yearly average of $30,192. Williams also recovered $391,485 in front pay and $100,000 for mental anguish in addition to attorneys' fees and costs. This appeal followed.

## STANDARD OF REVIEW

When reviewing a finding for legal sufficiency, we must credit evidence favorable to the judgment if a reasonable fact-finder could, disregard contrary evidence unless a reasonable fact-finder could not, and reverse the fact-finder's determination only if the evidence presented in the trial court would not enable a reasonable and fair-minded fact-finder to reach the judgment under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain the appellants' legal-sufficiency challenges if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere

7

scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *See id.* at 810. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

When considering a factual-sufficiency challenge, we consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Under either standard of review, we must be mindful that the jury as finder of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Raymond v. Rahme*, 78 S.W.3d 552, 556 (Tex. App.—Austin 2002, no pet.). The jury may choose to believe one witness and disbelieve another, and we must not impose our own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex. 2001). A trial court abuses its discretion in admitting or excluding evidence if it acts without reference to any guiding rules and principles, or if the act complained of is arbitrary and unreasonable. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). We will not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1; *see also Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). A

8

successful challenge to an evidentiary ruling usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753-54 (Tex. 1995).

## DISCUSSION

*Adverse Employment Action*

In its first issue on appeal, the Department argues that the evidence was legally and factually insufficient to support the trial court's judgment that Williams suffered an adverse employment action. A transfer or reassignment may rise to the level of an adverse employment action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (noting that "the EEOC has consistently found '[r]etaliatory work assignments' to be a classic and 'widely recognized' example of 'forbidden retaliation'").[7] To prove that a retaliatory transfer constitutes an adverse employment action, the "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citations and quotation marks omitted); *see also Montgomery County v. Park*, 246 S.W.3d 610, 614 (Tex. 2007) (adopting *Burlington* standard with appropriate modifications in case involving Texas Whistleblower Act); *Niu v. Revcor Molded Prods. Co.*, 206 S.W.3d 723, 731 (Tex. App.—Fort Worth 2006, no pet.) (applying *Burlington* standard to retaliation claim under TCHRA). The requirement that an action

---

[7] Though *Burlington* deals with Title VII retaliation actions, this Court "may look to federal civil rights law in interpreting cases brought under the Texas Commission on Human Rights Act." *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 315 n.2 (Tex. App.—Austin 1997, writ denied).

be "materially adverse" exists to separate significant from trivial harms, such as "petty slights, minor annoyances, and simple lack of good manners." *Burlington*, 548 U.S. at 68; *Niu*, 206 S.W.3d at 731.

To support his claim that a reasonable employee would have found the transfer from GPD to narcotics materially adverse, Williams presented evidence that GPD employees have a far greater opportunity to earn overtime pay than officers in the narcotics division. In 2002, his first year with GPD, Williams earned $16,813 in overtime pay. In 2003, Williams earned $9,346 in overtime pay, despite his allegations that his overtime was cut in retaliation for his discrimination and harassment complaints. After Williams was transferred to the narcotics division, his overtime pay fell to $4,669 in 2004, $2,540 in 2005, and $84 in each of 2006 and 2007. Williams also presented evidence that his loss of overtime was due to the lack of availability of overtime in the narcotics division as compared to GPD.

Further, Williams presented evidence that GPD members dress differently, wearing jackets and ties instead of standard police uniforms, and drive nicer government vehicles than their counterparts in other divisions. In terms of the work done by GPD, one fellow GPD member called it the "most important" job in Texas. Not only do GPD personnel protect and develop a close relationship with the Texas First Family, they also come in contact with visiting dignitaries. In addition, GPD members often travel on assignment to locations such as Australia and Mexico and to events such as inaugurations and the Super Bowl while taking advantage of a generous travel expense account during such trips. These opportunities are not available in other divisions of the Department, including the narcotics division.

The Department argues that the evidence presented by Williams concerns only his subjective impressions, thereby failing to meet the objective standard set out in *Burlington*. The

10

evidence that overtime pay is far more plentiful for GPD members than for officers in other divisions, however, is objective in nature. Further, the facts that GPD members dress differently than their counterparts in other divisions, drive more luxurious government vehicles, and have more opportunity to interact with high-ranking officials and travel on assignment provide objective proof of the differences between serving with GPD and serving with other divisions, such as narcotics.

The Department further argues that the transfer was not "equivalent to a demotion." Such analysis, however, relies on the standard used to evaluate adverse employment actions in cases brought under the substantive anti-discrimination provision of Title VII, under which a transfer must amount to an "ultimate employment decision" such as discharge or demotion. *See McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007) (evaluating race and sex discrimination claims under Title VII); *see also Alvarado v. Texas Rangers*, 492 F.3d 605, 613 (5th Cir. 2007). Post-*Burlington*, however, the standard used in substantive discrimination cases is not controlling when evaluating retaliation claims. *See McCoy*, 492 F.3d at 560 (explaining that *Burlington* altered standard in retaliation context). Instead, the *Burlington* standard for adverse employment actions in retaliation cases, as set forth by the Supreme Court and adopted in Texas courts, is both "more lenient" and "broader than for [substantive] discrimination, in that such actions are not limited to tangible employment acts," but rather encompass any acts that might dissuade a reasonable worker from making or supporting a charge of discrimination. *Johnson v. TCB Constr. Co.*, 334 Fed. Appx. 666, 671 (5th Cir. 2009) (citing *Burlington*, 548 U.S. at 67).[8]

---

[8] Factors considered under previous standards may, however, be helpful to the analysis under *Burlington*. *See* 548 U.S. at 71 (considering whether previous "position was objectively considered a better job" or "required more qualifications, which is an indication of prestige").

11

Under the *Burlington* standard, we conclude that the evidence of loss of overtime stemming from the transfer,[9] along with the evidence of other unique benefits received by GPD employees, supports the conclusion that a reasonable employee would have found the challenged transfer from GPD to the narcotics division materially adverse, such that the employee might well have been dissuaded from making or supporting a charge of discrimination.[10] There is more than a scintilla of evidence to support such a finding, and the finding is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. Accordingly, the evidence is legally and factually sufficient to show that an adverse employment action occurred. The Department's first issue is overruled.

[9] Numerous federal courts have considered loss of overtime opportunities to constitute or contribute to a finding of an adverse employment action in the context of retaliation claims, even under the stricter pre-*Burlington* standard. *See, e.g.*, *Broska v. Henderson*, 70 Fed. Appx. 262, 267 (6th Cir. 2003) ("[T]he denial of overtime can constitute an adverse employment action."); *Lentz v. City of Cleveland*, 410 F. Supp. 2d 673, 685 (N.D. Ohio 2006) ("[L]ost opportunities for overtime and secondary employment constitute adverse employment actions."); *Albright v. City of Philadelphia*, 399 F. Supp. 2d 575, 592 (E.D. Pa. 2005) (discussing "the adverse employment actions of loss of training and overtime opportunities"); *Connolly v. Mitsui O.S.K. Lines, Inc.*, No. 04-5127, 2009 U.S. Dist. LEXIS 86195, at *21 (D.N.J. Sept. 21, 2009) (noting that claimed "loss of overtime opportunities . . . would constitute an adverse employment action if true"); *Perez v. Consolidated Edison Corp.*, No. 02 Civ. 2832, 2006 U.S. Dist. LEXIS 67459, at *38 (S.D.N.Y. Sept. 20, 2006) ("In this case, a reasonable finder of fact could determine that the loss of shift differential and overtime pay, the change of work schedule and the change of office location amounted to an adverse employment action for purposes of plaintiff's retaliation claim.").

[10] In fact, other GPD members indicated that Williams's transfer made them less apt to speak out about perceived discrimination. In an affidavit taken as part of the administrative inquiry stemming from Williams's post-transfer complaint to the Department, Sergeant Richard Farias stated that though "[t]here are times I see things that do not look right to me . . . I feel that if I were to point out something that was wrong like that, I would be re-assigned from the Detail, like Thomas Williams was." He added, "I respect Thomas for speaking up when things seemed wrong." In addition, Roscoe Hughey, who served on GPD with Williams, stated in an affidavit that in the wake of Williams's transfer, "[n]ow everyone on the Detail knows they can't talk about things or voice an opinion against anything the power group does or they will be asked to leave."

12

*Awards of Back Pay and Front Pay*

In its second issue on appeal, the Department argues that the evidence to support the jury's awards of back pay and front pay is legally and factually insufficient.[11] In order for a jury award to survive a legal sufficiency challenge, "there need only be some evidence that a substantial loss occurred . . . which affords a reasonable basis for estimating the amount of that loss." *Carrow v. Bayliner Marine Corp.*, 781 S.W.2d 691, 695 (Tex. App.—Austin 1989, no writ). However, "'evidence corresponding to the precise amount found by the jury is not essential' in order to withstand a legal-sufficiency challenge." *Pleasant v. Bradford*, 260 S.W.3d 546, 559 (Tex. App.—Austin 2008, pet. denied); *see also City of Austin v. Gifford*, 824 S.W.2d 735, 740 (Tex. App.—Austin 1992, no writ) (equating challenge to legal sufficiency of jury's award of back pay to "argument . . . that *any* award of back wages was improper") (emphasis added).

While a legal sufficiency inquiry ends when some evidence to support the award is found, factual sufficiency analysis also examines whether the precise amount of a jury's award is proper. *Carrow*, 781 S.W.2d at 695. In determining whether the amount of an award is supported

---

[11] In its appellant's brief, the Department expressly challenges only the legal sufficiency of the front and back pay awards. However, the Department's briefing of the issue includes some argument regarding the precise amount of the awards, analysis of which is germane to a factual sufficiency challenge. *See Pleasant v. Bradford*, 260 S.W.3d 546, 559 (Tex. App.—Austin 2008, pet. denied) (holding that "[t]he legal sufficiency test is inapplicable" when evaluating precise amount awarded by jury); *Carrow v. Bayliner Marine Corp.*, 781 S.W.2d 691, 695 (Tex. App.—Austin 1989, no writ) (explaining that when challenging amount of jury award, proper "remedy on appeal is a point of error asserting factual [not legal] insufficiency or excessiveness of the verdict"). While the Department's reply brief does not add new arguments, it explicitly disputes both the legal and factual sufficiency of the back and front pay awards. Consequently, based on the arguments put forth in the briefs, we construe the Department's second issue on appeal as challenging both the legal and factual sufficiency of the back and front pay awards. *See* Tex. R. App. P. 38.9 (explaining that briefing rules are to be construed liberally).

13

by factually sufficient evidence, Texas courts have held that "[t]he jury has the discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for the jury's calculation." *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied).[12]  So long as a rational basis for the calculation of damages exists, a jury's finding will not be disregarded merely because its reasoning in arriving at its figure may be unclear. *Pleasant*, 260 S.W.3d at 559; *see also Mayberry*, 948 S.W.2d at 317 (applying same rationale in employment context).  Where the evidence supports a range of potentially appropriate awards (as opposed to two or more binary options), Texas courts have found jury awards to be supported by factually sufficient evidence when they do not "differ greatly from either the top end of the range or the bottom end." *Mayberry*, 948 S.W.2d at 317.

*Back Pay*

Back pay compensates an employee for the amount of money the employee would have earned had the prohibited employment action not taken place, minus the amount the employee earned following the prohibited action.  *See* Tex. Lab. Code Ann. § 21.258(c); *West Telemarketing Corp. Outbound v. McClure*, 225 S.W.3d 658, 668 (Tex. App.—El Paso 2006, pet. granted, judgm't vacated w.r.m.).

In this case, Williams testified that the amount he was able to earn in overtime pay declined precipitously after his transfer from GPD to the narcotics division.  As summarized above,

---

[12]  We note that *Mayberry* concerns the legal sufficiency of a back pay award.  *See* 948 S.W.2d at 317.  Under the precedent discussed above, however, we consider the evaluation of the amount awarded by the jury better suited to the factual sufficiency context.

Williams earned $16,183 and $9,346 in overtime during his two years with GPD. After his transfer, Williams earned a total of $7,377 in overtime during four years of service with the narcotics division from 2004 through 2007. Williams and others testified that the decline in overtime was not by choice, but rather due to the lack of availability for overtime with the narcotics division (as opposed to the virtually unlimited overtime available to GPD members).

Williams also presented the expert testimony of Glover, who testified that the overall amount of overtime pay available to GPD personnel had not only remained stable but had significantly increased since Williams's departure. These increases in overtime pay occurred despite only a small bump in the number of GPD members, from 20 in 2003 to about 25 in 2008. Consequently, numerous GPD employees who had served at the same time as Williams had seen the amount they personally earned in overtime pay increase in the period following Williams's transfer. Glover also testified about the amounts earned in overtime pay by three GPD members who joined the Detail near the time that Williams did.[13]

---

[13] The Department argues that this Court should not consider the testimony of Glover in determining whether Williams offered legally sufficient evidence to support his back pay award. Specifically, the Department states that the "totality of Glover's testimony is speculative and just the type of evidence the Texas Supreme Court has found to be irrelevant and not probative of any fact for which it is offered." The Department cites *Coastal Transp. Co. v. Crown Central Petroleum Corp.* for the proposition that the "bare opinions alone" of an expert are not considered "competent testimony." 136 S.W.3d 227, 232 (Tex. 2004). However, Glover's testimony that overall overtime had increased since Williams departed and his testimony that the overtime pay of several members had increased since Williams departed are based on the Department's own payroll records. While the Department may disagree with the conclusions that may be drawn from such data, the proposition that Glover's testimony is "bare opinion" is not supported by the record. Further, even without the testimony of Glover, the testimony of Williams and the exhibits demonstrating Williams's reduction in overtime pay provide sufficient evidence for the jury to assign some value to the employee's lost compensation.

15

The testimony and exhibits offered by Williams at trial provide some evidence of lost wages and also provide a reasonable basis for estimating the proper amount of a back pay award. The evidence presented constitutes more than a scintilla, and consequently the evidence is legally sufficient to support the jury's award of back pay. *See Carrow*, 781 S.W.2d at 695.

The evidence presented by Williams is also factually sufficient to support the amount of back pay. As noted above, Glover testified about the overtime earnings of three GPD employees who were "similarly situated" to Williams based on when they started serving with GPD.[14] The high earner among these, Wayne Wallace, started one month before Williams on GPD, also as a sergeant. Wallace earned $16,447 in overtime on GPD in 2002, compared to Williams's $16,813. Wallace had more experience with the Department before starting with GPD and was promoted to lieutenant in 2003. Though the Department argues that the differences between the careers of Wallace and Williams prevent the consideration of Wallace as a similarly situated employee, the evidence presented to the jury would enable a reasonable finder of fact to conclude that the two were similarly situated for the purposes of calculating overtime back pay.

During the period from 2004 to 2007, Wallace earned an average of $34,214 per year, with a single-year high of $36,389. Wallace's single-year high, when prorated for the roughly 50 months that elapsed between January 7, 2004 (when Williams was reassigned) and

---

[14] Federal courts evaluating awards of overtime under the Back Pay Act, 5 U.S.C. § 5596 (2000), have approved awards "based either upon an employee's prior overtime experience or . . . upon the overtime experience of similarly situated employees." *Naekel v. Department of Transp.*, 850 F.2d 682, 684 (Fed. Cir. 1988) (noting that "[t]his formula appears to be fair and apt"). In determining whether employees are similarly situated in terms of overtime opportunities, relevant considerations include seniority, skill level, shift worked, and position held. *Ball v. United States Postal Serv.*, 53 Fed. Appx. 910, 912 (Fed. Cir. 2002).

February 25, 2008 (when the case went to trial), supports an award of up to $151,621 in back pay. *See West Telemarketing*, 225 S.W.3d at 668 (explaining that, in determining award for 128 weeks of back pay, "[t]he jury could have based lost earnings on Appellee's highest weekly earnings statement"). When this figure is reduced to account for the $7,377 in overtime that Williams earned during that time period, the upper end of the range drops to $144,244. *See id.* (subtracting offsets to determine upper end of range of options). The jury's award of $128,316 falls comfortably below this number. Accordingly, we conclude that the evidence supports a range of potential awards and the jury's actual award is within the range of options presented at trial. As the result is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust, the jury's award of back pay is supported by factually sufficient evidence.

*Front Pay*

The Department also challenges the legal and, as construed by this Court, factual sufficiency of the jury's award of front pay. Front pay is awarded to compensate the plaintiff for future lost wages and benefits. *Giles v. General Elec. Co.*, 245 F.3d 474, 489 n.27 (5th Cir. 2001). While reinstatement is generally preferable to an award of front pay, front pay may be awarded in lieu of reinstatement, especially when reinstatement is not a feasible option.[15] *See Hansard v. Pepsi-Cola Metro. Bottling Co., Inc.*, 865 F.2d 1461, 1470 (5th Cir. 1989); *Wal-Mart Stores, Inc., v. Davis*, 979 S.W.2d 30, 45 (Tex. App.—Austin 1998, pet denied). The federal courts have identified numerous factors to be considered when awarding front pay, including the length of

---

[15] At a hearing on motion for judgment before the trial court, the parties agreed that reinstatement would not be appropriate given the facts and circumstances of this case.

17

prior employment, the permanency of the position held, the nature of the work, the age and physical condition of the employee, possible consolidation of jobs, and the myriad other non-discriminatory factors which could validly affect the employer/employee relationship. *Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007).

In this case, the jury heard evidence that Williams was thirty-eight years old and in good physical condition. It heard that Williams had been a career law-enforcement officer after serving in the military, though he had held several different posts (including stints with the El Paso police and the highway patrol and narcotics divisions of the Department) during his approximately fifteen years working in law enforcement. It heard evidence that some GPD sergeants spend their entire careers with GPD, some staying on the Detail for more than fifteen years. The jury heard Williams's own testimony that he had sought the position with GPD in order to relocate his wife and children to Austin and maintain close proximity to them, and that he had intended to finish his career with the Department, which in his view meant working at GPD for "at least another 18 years." The jury also heard evidence that Williams had applied for a job with the federal Secret Service in the fall of 2004, when he was still a GPD member.[16] As summarized above, the jury heard evidence that

---

[16] The Department points to this application to support its argument that Williams did not intend to stay at the Department for the remainder of his career. However, the fact that Williams applied for a Secret Service job more than three years prior to trial does not necessarily lead to the conclusion that, at the time of trial, Williams did not intent to remain at the Department until retirement. Indeed, the fact that he was not hired by the Secret Service—potentially in part due to Armistead's negative recommendation—might lead to the conclusion that, with fewer career options, he would be *more* likely to remain with the Department than had he never applied to work for the Secret Service.

Williams had earned GPD overtime pay of $16,183 in 2003 and $9,346 in 2004, and that similarly situated employees earned up to $36,389 in overtime pay in a single year.

After hearing this evidence, the jury awarded Williams $391,485 in front pay. Under the legal sufficiency standard, there is more than a scintilla of evidence to support an award of front pay as well as a reasonable basis for calculating the proper amount. The jury could have concluded that Williams would have remained with GPD until the end of his career. *See West Telemarketing*, 225 S.W.3d at 668-69 (noting that employee "had testified that she had intended to continue working for [employer] until her retirement" and that "[t]he jury was entitled to believe her"). Further, the evidence of Williams's loss of overtime and the overtime earnings of other GPD employees provides a reasonable basis for the jury to calculate damages. *See Pleasant*, 260 S.W.3d at 559. Accordingly, the Department's challenge to the legal sufficiency of the jury's award of front pay fails.

In addition, the amount of front pay awarded was within the range of options presented at trial, and is thereby supported by factually sufficient evidence. In this case, the evidence presented at trial supports a range of awards. *See id.* Based on Williams's testimony, the jury could have concluded that Williams would remain with the Department until the end of his career in 18 years. The jury could also have concluded that, based on Wallace's overtime earnings, Williams would have earned up to $36,389 in overtime per year for the 18 years until his retirement, numbers that would support an award ranging up to $655,002.[17] *See West Telemarketing*, 225 S.W.3d at 668-

---

[17] We note that Williams's front pay award is likewise supported by the overtime earned by the other two GPD sergeants identified as "similarly situated." The middle earner in the group, Robert Pena, had a single-year high of $26,754 in overtime earnings, which over 18 years would support an award of $481,572, while the low earner in the group, Shannon O'Neil, had a single-year high of $22,972, which would support an award of $413,496.

69 (relying on highest earnings statement to determine range of awards). The jury's award falls well within this range, and the result is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust.

The Department, however, argues that the award of front pay is impermissibly speculative. Such an argument overlooks the fact that courts have consistently held that "[f]ront pay can only be calculated through intelligent guesswork" and have recognized front pay's "speculative character by according wide latitude in its determination." *Downey*, 510 F.3d at 544 (quotation marks omitted). Accordingly, the evaluation of the legal and factual sufficiency of a front pay award does not hinge on whether the jury's calculations involved some speculation, but whether the jury's award is supported by more than a scintilla of evidence and falls within the range of options presented at trial. As our analysis indicates that the front pay award in this case meets these criteria, we conclude that the award is supported by the evidence.

As the awards of back and front pay are supported by legally and factually sufficient evidence, the Department's second issue on appeal is overruled.

*Admissibility of Evidence*

In its third issue on appeal, the Department argues that the trial court abused its discretion by admitting the report of the Department's internal investigation of sexual harassment and the determination letter Williams received from the EEOC. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401; *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 n.8 (Tex. 2008).

20

Trial courts may exclude relevant evidence if its probative value is substantially outweighed by its prejudicial effect. Tex. R. Evid. 403; *State v. Malone Serv. Co.*, 829 S.W.2d 763, 767 (Tex. 1992). We uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling, *Owens-Corning*, 972 S.W.2d at 43, and will not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992).

*The Internal Affairs Investigation*

The Department argues that the trial court abused its discretion by admitting the report of the Department's internal investigation initiated by Williams's memo detailing the sexual harassment of a female Department trooper by a GPD sergeant. The Department contends that the report was not relevant to Williams's retaliation or discrimination claims. However, as the Department admits, the report provides evidence that Williams engaged in a protected activity, a necessary element for a retaliation claim under the TCHRA. *See Mayberry*, 948 S.W.2d at 315.

In addition, such reports may be "extremely relevant" as to the credibility of the person making the complaint and may also shed light on whether the reasons given by the employer for retaliatory action were pretextual. *See Busby v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991) (reversing trial court's decision not to admit internal affairs report as abuse of discretion). In this case, the internal affairs report corroborated the details of the sexual harassment complaint that Williams had made based on his conversation with a Department trooper. According to Williams, the trooper had told him that a GPD sergeant had made inappropriate sexual remarks to her. The Department's internal affairs report, which contains statements by the trooper herself, confirms that

21

Williams accurately related the details of his conversation with the trooper when making his complaint. Further, the trooper's statements in the internal affairs report indicate that Armistead was mistaken when, according to his own notes, he informed one of Williams's supervisors that the trooper had indicated that she never made statements about sexual harassment to Williams.

Consequently, as the report showed both that Williams engaged in a protected activity and that Williams had been truthful when relating the trooper's experience—and had not fabricated the allegations, as suggested by Armistead's notes—we conclude that the trial court did not abuse its discretion in admitting the report into evidence.[18]

*The EEOC Determination Letter*

The Department also argues that the EEOC determination letter admitted by the trial court was substantially more prejudicial than probative and therefore should not have been admitted into evidence. "EEOC determinations and findings of fact, although not binding on the trier of fact, are generally admissible as evidence in civil proceedings as probative of a claim of employment discrimination." *Johnson v. Scott Fetzer Co.*, 124 S.W.3d 257, 263 (Tex. App.—Fort Worth 2003, pet. denied) (citing *Lindsey v. Prive Corp.*, 161 F.3d 886, 894 (5th Cir. 1998)). Indeed, EEOC determinations are considered "presumptively admissible because they are so highly probative of discrimination that their probity outweighs any possible prejudice to defendant." *EEOC v. Manville*

---

[18] Even if the report were inadmissible, the Department recognizes that it must show that the admission of the evidence "probably caused the rendition of an improper judgment." Tex. R. App. P. 44.(a)(1); *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992). Though the Department contends that it was forced to try a "mini-trial" on the sexual harassment complaint, it points to only twenty pages—out of a roughly 1900-page trial transcript—on which the sexual harassment complaint was discussed.

*Sales Corp.*, 27 F.3d 1089, 1095 (5th Cir. 1994) (quoting *McClure v. Mexia Indep. Sch. Dist.*, 750 F.2d 396, 400 (5th Cir. 1985) (citations and punctuation marks omitted)).  A trial court may, however, exclude an EEOC letter that is so conclusory that it possesses very little probative value. *Johnson*, 124 S.W.3d at 263 (indicating the court may exclude letter that "does not outline, even summarily, the evidence upon which it relies for its conclusions").

In this case, the EEOC's determination letter summarizes its investigation into Williams's claims of discrimination and retaliation.  While it includes little evidence of discrimination, the letter also states that "the Commission is unable to conclude that Charging Party was discriminated against because of his race, Black."  The letter goes into much greater detail regarding Williams's retaliation claim, specifying the complaints Williams made to GPD and Williams's subsequent treatment by GPD before concluding that, "[b]ased on these analyses, it appears more likely than not that Charging Party was given a negative evaluation and removed from the Governor's Protective Detail in retaliation."

Though the Department contends that the letter was "untrustworthy and one-sided," our review of the contents of the letter indicates that the EEOC exhibited care and diligence in evaluating Williams's claims and provided evidence for its determination that Williams was likely the victim of retaliation.  Consequently, we do not find the letter to be conclusory or lacking in probative value.  *See Johnson*, 124 S.W.3d at 263 (explaining that conclusory letters should not be admitted).  As the EEOC's determination letter was probative of Williams's retaliation claim without undue prejudice to the Department, we conclude that the trial court did not abuse its discretion in admitting the letter.

As the trial court did not abuse its discretion in admitting the internal affairs report or the EEOC determination letter, the Department's third point of error is overruled.[19]

## CONCLUSION

Because we find no reversible error, we affirm the judgment of the trial court.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Waldrop and Henson

Affirmed

Filed: February 19, 2010

_____

[19] In its original brief, the Department included an additional issue on appeal arguing that the trial court incorrectly charged the jury. As the Department withdrew the issue as waived in its reply brief, we do not address it here.